# BROOKS-SCANLON CORPORATION *v.* UNITED STATES.

# UNITED STATES *v.* BROOKS-SCANLON CORPORATION.

### APPEALS FROM THE COURT OF CLAIMS.

Nos. 337, 385. Argued January 8, 1924.—Decided May 12, 1924.

1. Orders of the Emergency Fleet Corporation directed to a ship-builder expropriated a vessel in process of construction under a contract between the builder and the plaintiff, together with the materials purchased by the builder for its completion, the benefits and advantages of payments made, and of plans, specifications and prior inspection service provided, by the plaintiff, and placed the Fleet Corporation in the plaintiff's shoes with respect to the past and future execution of the contract by the builder. The United States thus obtained the ship early and the benefit of prices much lower than those prevailing at time of requisition. *Held:*

(a) That the plaintiff's rights under the contract with the builder were taken. P. 119.

(b) That the just compensation to which the plaintiff was entitled did not depend upon the title to the materials used in the construction, and was not to be gauged by the progress payments made, or by the compensation payable if the Government had merely canceled the contract; but was to be measured by the value of the plaintiff's rights under the contract at the time of the taking. P. 121.

(c) Just compensation is the sum which, considering all the circumstances, uncertainties of the war, etc., probably could have been obtained for an assignment of the plaintiff's rights under the contract, i. e., the sum that would in all probability result from fair negotiations between an owner willing to sell and a purchaser desirous of buying. P. 123.

(d) The value of such ships at the time of requisition, the then probable value at the time fixed for delivery, the contract price, payments made and to be made, the time to elapse before completion and delivery, the possibility that, by reason of the Government's activity in controlling materials, the contractor might not have been able to complete the ship on time, loss of the use of money to be sustained, other expenditures to be made between requisition and delivery,—all should be given consideration in determining the plaintiff's loss caused by the taking. P. 125.

2. Replacement cost not necessarily the sole measure of or guide to value in ascertaining just compensation. *Id.*

58 Ct. Clms. 274, reversed.

APPEAL and cross appeal from a judgment of the Court of Claims in an action to recover a balance alleged to be due as just compensation for the taking by the Shipping Board of the plaintiff's rights under a contract for the construction of a ship.

*Mr. John Junell,* with whom *Mr. William A. Lancaster, Mr. David F. Simpson* and *Mr. Edward P. Sanborn* were on the brief, for Brooks-Scanlon Corporation.

Plaintiff's contract was property within the protection of the Fifth Amendment. *Monongahela Nav. Co.* v. *United States,* 148 U. S. 312; *Long Island Water Supply Co.* v. *Brooklyn,* 166 U. S. 685; *New Orleans Gas Co.* v. *Louisiana Light Co.,* 115 U. S. 650; *Cincinnati* v. *Louisville & Nashville R. R. Co.,* 223 U. S. 390; *West River Bridge Co.* v. *Dix,* 6 How. 507; *Chicago, B. & Q. Ry. Co.* v. *Drainage Commrs.,* 200 U. S. 561.

The President was authorized to requisition it.

The contract was taken. The defendant made itself the successor of the plaintiff under the contract—the owner of plaintiff's rights. It could have become such owner in no way other than by the condemnation and taking of the contract.

When the defendant displaced the plaintiff under the contract and took that place itself, and exercised all the rights the plaintiff had under it, and agreed to pay to the builder, and did pay, the balance of the installments

of the contract price, it took over and appropriated the contract and all the rights and interests the plaintiff had in it.

The defendant could not take the uncompleted ship, as it did do, and order the builder to complete the construction in accordance with the contract, plans and specifications, pay the builder the balance of the contract price, appropriate the amount which had been paid by the plaintiff, and receive from the builder the ship completed in accordance with the contract with no change whatever except a slight change for the military protection of the vessel, without taking the contract within the meaning of the Fifth Amendment.

The defendant took and used the plaintiff's plans and specifications, its service of inspection and classification of the vessel, its insurance while under construction, the guaranty of materials and labor, the vessel when completed, the payments made by the plaintiff to the builder, all of which were valuable rights of the plaintiff under the contract; and there was no provision of the Act of June 15, 1917, under which these rights could have been taken without taking the contract itself. They were essential parts of the contract and could not have been separated from it.

Although under the contract the legal title to the ship during its construction was in the Shipbuilding Corporation, the plaintiff then had such substantial rights and equities in the uncompleted ship as the courts recognize and protect.

The parties to the contract evidently understood this, for they provided in it that the builder should keep the vessel insured at all times during the construction in an amount at least equal to payments made by the plaintiff, with loss if any payable as their interests might appear.

A ship is personal property of such peculiar character that both in England and in this country an action for

specific performance of contracts relating to it will lie. *Lynn* v. *Chaters,* 2 Keen, 521; *Claringbold* v. *Curtis,* 21 L. J. Ch. N. S. 541; *Duff* v. *Fisher,* 15 Cal. 381; *Peer* v. *Kean,* 14 Mich. 354; *Menier* v. *Donald,* 165 N. Y. S. 50; *Great Lakes Transp. Co.* v. *Scranton Coal Co.,* 239 Fed. 603.

The contract and the rights of the plaintiff thereunder were so connected with and involved in the ship itself, that the requisition of the vessel under construction was a taking and appropriation of the contract, and all plaintiff's rights under it, including its equitable rights and interests.

This is true whether the United States made use of the contract thereafter or made it valueless to the plaintiff. *United States* v. *Lynah,* 188 U. S. 445; *Pumpelly* v. *Green Bay Co.,* 13 Wall. 166; *Chappell* v. *United States,* 34 Fed. 673; *Long Island Water Supply Co.* v. *Brooklyn,* 166 U. S. 685; *Cincinnati* v. *Louisville & Nashville R. R. Co.,* 223 U. S. 390; *Monongahela Nav. Co.* v. *United States,* 148 U. S. 312.

It was conceded by the defendant and found by the Court of Claims that the Government did requisition the ship under construction. It requisitioned then the plaintiff's equitable rights and interests in the ship springing out of the contract in any event. And if, by taking the ship, it rendered the contract and the obligation of the Shipbuilding Corporation under it valueless to the plaintiff, it thereby appropriated the contract, whether it used the contract thereafter or not.

*Omnia Commercial Co.* v. *United States,* 261 U. S. 502, does not rule the case at bar.

In that case no specific steel plate had been appropriated to the plaintiff's contract, and no part of the purchase price had been paid. The Omnia Company had no equitable title or interest in the steel plate, and specific performance of its contract could not be enforced.

There the United States dealt only with the Steel Company. Here it dealt with both parties to the contract.

There the United States did not step into the shoes of the plaintiff under the contract and use it; the contract was made simply unenforceable as between the Omnia Company and the Steel Company. Here the contract was kept alive for the use of the Government and used.

There the damages resulting to the Omnia Company were merely consequential. Here the loss to the plaintiff was the natural, direct and inevitable result of what the defendant did.

There the contract was destroyed under the police power of the United States. Here the contract was taken under the right of eminent domain.

This suit is a part of the authorized procedure initiated by the United States for the condemnation of the ship and all the rights and interests of the plaintiff under the contract. *Seaboard Air Line Ry. Co.* v. *United States,* 261 U. S. 299.

The value to the plaintiff of the contract, and its rights and interest in the ship under the contract, was the difference between the value of the ship when requisitioned and the amount which the plaintiff was then required under the contract to pay in order to get it.

Just compensation is the value to the owner at the time of the taking of the property taken. *Monongahela Nav. Co.* v. *United States,* 148 U. S. 312; *Seaboard Air Line Ry. Co.* v. *United States,* 261 U. S. 299; *United States* v. *Rogers,* 257 Fed. 397; *Sanitary District of Chicago* v. *Pittsburgh Ry. Co.,* 216 Ill. 574; *United States* v. *New River Collieries Co.,* 262 U. S. 341.

The plaintiff is entitled to interest as a part of its just compensation upon the value of the property taken from the date of the requisition. *Seaboard Air Line Ry. Co.* v. *United States,* 261 U. S. 299; *United States* v. *Benedict,* 261 U. S. 294; *Prince Line* v. *United States,* 283 Fed. 535; *United States* v. *Rogers,* 255 U. S. 163.

*Mr. Henry M. Ward*, with whom *Mr. Solicitor General Beck, Mr. Chauncey G. Parker* and *Mr. Alfred A. Wheat*, Special Assistant to the Attorney General, were on the brief, for the United States.

The findings of fact clearly show that plaintiff's contract with the shipbuilder was not requisitioned.

If plaintiff's contentions should prevail, and this Court should hold (a) that the contract was, in fact and in law, requisitioned, and (b) that the just compensation for such requisition is the value of the contract at the date thereof, which is the same as the then value of the ship, which concededly was requisitioned, and (c) that plaintiff is entitled to interest upon such value from that date,—the United States will in this case be required to pay the plaintiff upwards of $975,000 additional, with interest for over six years. Furthermore, cases in which others have filed a brief as *amici curiae* involve several millions more, while the amount involved in other similar cases now pending in the Court of Claims is, as justly remarked by this Court in *Omnia Commercial Co.* v. *United States*, 261 U. S. 513, "appalling."

It is, therefore, important to note the intent of the Fleet Corporation, as evidenced by its action as the delegate of the President under the Act of June 15, 1917. This action completely negatives plaintiff's contention that its contract was requisitioned.

The order is explicit in its specification of the property requisitioned. While it refers to "contracts requisitioned" and to "ships and contracts taken over," the contracts referred to are clearly, from the context, the commitments (necessarily by contract) for the materials, etc.

It seems clear from the facts found that the Fleet Corporation had no intention of requisitioning the plaintiff's contract, and that both as matter of fact and of law it did not do so and that this was clearly understood by the plaintiff at the time. It does not appear from the

findings that the plaintiff then contended that its contract was requisitioned. On the contrary, it acquiesced in the requisition of the ship and furnished, as requested, a statement of the amounts which it had paid to the shipbuilder, in apparent reliance upon the intention of the Fleet Corporation to reimburse it for such expenditures.

While, by a subsequent contract of December 8, 1917, the United States, through the Fleet Corporation, agreed with the Shipbuilding Company that it should be credited under the terms of the construction contract then made with the amounts paid prior to August 3, 1917, by the plaintiff, these amounts of money were in no sense requisitioned from the shipbuilder, much less were they requisitioned from the plaintiff. As between the shipbuilder and the United States, the latter agreed to indemnify the shipbuilder against the claim of the plaintiff. As between the United States and the plaintiff, the former stated in the letter of August 28, 1917, that it was its intention to reimburse the plaintiff for all amounts paid by plaintiff to the shipbuilder as soon as such amounts should be ascertained. This intention was carried out by the Shipping Board when it made an award to the plaintiff of the moneys which it had actually paid to the shipbuilder, and in addition also for the increase in the value of materials assumed to have been purchased with these particular moneys; but it is clear that the United States did not requisition anything whatsoever from the plaintiff. *Monongahela Nav. Co.* v. *United States,* 148 U. S. 312, distinguished.

This case is controlled by the decision of this Court in *Omnia Commercial Co.* v. *United States,* 261 U. S. 502. In that case, at the time of the requisition of the steel from the steel company, the plaintiff or its assignors had paid large sums to the steel company on account of the purchase of the steel and had sold the same to responsible parties, and from these sales would have realized a profit of nearly a million dollars.

If the action were maintainable on the theory of requisition of the plaintiff's contract, the judgment should be reversed and the claim dismissed, because at the date of the alleged requisition the contract was without value.

The amount of just compensation to which a plaintiff is entitled when his property is taken for public use is the market value of the property at the date of taking. The Court may properly take judicial notice of the historical fact that on August 3, 1917, or within a few days thereafter, every ship of over 2,500 deadweight tons capacity was requisitioned by the Fleet Corporation in behalf of the United States under the Act of June 15, 1917, by requisition orders substantially identical with the one issued to the shipbuilder in this case. Under these circumstances, it can hardly be properly contended that the contract had any market value, for it was a contract impossible of performance. It may be that if there had been a free market and the ship had then been completed, the ship would have had this value, but the Court of Claims does not find as a fact that the contract on the date of requisitioning of the ships was of any value.

The Court may, however, properly take judicial notice of the further historical fact that, at or about the time of the requisitioning of these ships, all shipbuilding material throughout the United States was likewise requisitioned by the Government, and particularly all steel and the entire steel industry were requisitioned, and no private shipbuilder was permitted to acquire any steel for shipbuilding for any but government ships. Assuming then merely for the argument that there is a basis for the plaintiff's contention that the shipbuilding contract was requisitioned, the contract at the date of requisition was valueless because it could not be performed by the shipbuilder. *Vogelstein & Co.* v. *United States,* 262 U. S. 337; *Morrisdale Coal Co.* v. *United States,* 259 U. S. 188; *Pine Hill Co.* v. *United States,* 259 U. S. 191.

The theory of the plaintiff confounds the subject matter of the contract with the covenants of performance.

The court below erred in allowing interest (partly compounded) on the theory that the payments made by the plaintiff to the shipbuilder were requisitioned.

*Mr. Charles S. Haight, Mr. T. M. Cunningham, Jr., Mr. William B. King, Mr. John J. Fitzgerald* and *Mr. Wharton Poor,* by leave of Court, filed a brief as *amici curiae.*

*Mr. Ira Jewell Williams, Mr. Carlos Berguido, Jr., Mr. John H. Stone, Mr. F. R. Foraker* and *Mr. Francis Shunk Brown,* by leave of Court, filed a brief as *amici curiae.*

MR. JUSTICE BUTLER delivered the opinion of the Court.

This case arises out of the exertion of the power of requisition conferred on the President by c. 29, 40 Stat. 182, approved June 15, 1917, known as the Emergency Shipping Act.[1]　There is involved the question whether

---

[1] " The President is hereby authorized and empowered　.　.　.

"(a) To place an order with any person for such ships or material as the necessities of the Government, to be determined by the President, may require during the period of the war and which are of the nature, kind and quantity usually produced or capable of being produced by such person.

"(b) To modify, suspend, cancel, or requisition any existing or future contract for the building, production, or purchase of ships or material.

"(c) To require the owner or occupier of any plant in which ships or materials are built or produced to place at the disposal of the United States the whole or any part of the output of such plant, to deliver such output or part thereof in such quantities and at such times as may be specified in the order.

"(d) To requisition and take over for use or operation by the United States any plant, or any part thereof without taking possession of the entire plant, whether the United States has or has not any contract or agreement with the owner or occupier of such plant.

a certain contract for the construction of a ship was requisitioned: and if it was, upon what basis is just compensation to be ascertained.

The act empowered the President (a) to order from any person for government use ships or ship material of kind and quantity usually produced by such person; (b) to requisition contracts for the building of ships; (c) to require the owner of any shipbuilding plant to place at the disposal of the United States the whole or any part of the output of the plant; (d) to requisition any shipbuilding plant or part thereof; (e) to requisition any ship in process of construction; and compliance with all orders issued under the act was made obligatory. By executive order of July 11, 1917, he delegated these powers to the United States Shipping Board Emergency Fleet Corporation. On August 3, 1917, the claimant was the assignee

"(e) To purchase, requisition, or take over the title to, or the possession of, for use or operation by the United States any ship now constructed or in the process of construction or hereafter constructed, or any part thereof, or charter of such ship.

" Compliance with all orders issued hereunder shall be obligatory on any person to whom such order is given, and such order shall take precedence over all other orders and contracts placed with such person. . . .

" Whenever the United States shall cancel, modify, suspend or requisition any contract, . . . it shall make just compensation therefor, to be determined by the President; and if the amount thereof, so determined by the President, is unsatisfactory to the person entitled to receive the same, such person shall be paid seventy-five per centum of the amount so determined by the President and shall be entitled to sue the United States to recover such further sum as, added to said seventy-five per centum, will make up such amount as will be just compensation therefor, in the manner provided for by section twenty-four, paragraph twenty, and section one hundred and forty-five of the Judicial Code.

" The President may exercise the power and authority hereby vested in him, and expend the money herein and hereafter appropriated through such agency or agencies as he shall determine from time to time: . . ."

and owner of a contract by which the New York Ship-building Corporation agreed to construct a ship, known as hull #193. The contract was made March 28, 1916; and after some modification, it provided for the construction of a ship of 8597 deadweight tons, to be completed and delivered on or before February 1, 1918. The contract price was $831,630.

Prior to August 3, 1917, the claimant or its assignor had secured the services of an architect, furnished plans and specifications to the builder, employed a bureau to inspect the work as it progressed, and had paid to the builder on account of the contract price instalments amounting to $419,500, which, with interest paid, architect's fees, and the value of the plans and specifications, amounted to $473,710.58, exclusive of the cost of inspection.

Immediately after the execution of the contract, the builder ordered all materials required, for which sufficient data then existed, and, before August 3, 1917, completed its orders for substantially all that were needed to perform the contract. Between 35 and 40 per cent. of the required materials had been delivered to the builder ready for use, and, on that date, the ship was about 19 per cent. completed. The Court of Claims found that all materials so ordered were delivered at the prices fixed in the orders and were used in the construction of the ship; and that nothing was purchased after that date, except materials used for construction, at a cost of $31,000, ordered for military protection. At that time claimant held on deposit in various solvent banks a sum of money sufficient to pay all the remaining instalments of the contract price; and the builder was ready and willing to perform the contract.

On August 3, 1917, the Emergency Fleet Corporation served on the builder its order and notice requisitioning all of the ships, including hull #193, under construction in

the builder's shipyard, and the materials necessary for their completion. The order required the builder to complete the ships. It stated that compensation would be paid for "ships, materials, and contracts requisitioned." The builder was required to furnish plans and specifications of the requisitioned ships, and a statement of the payments made and amounts still due, and other information "necessary to a fair and just determination of the obligations of the Emergency Fleet Corporation in taking over these ships and contracts."

On August 22, the Fleet Corporation caused its district officer to deliver to the builder a formal written notice which recited that the ships had been requisitioned, and that an order had been given the builder to complete them, and ordered the builder to "proceed . . . in conformity with the requirements of the contract, plans, and specifications under which construction proceeded prior to the requisition of August 3, 1917 . . . "; and stated, "For the work of completion heretofore and herein ordered the corporation will pay to you amounts equal to payments set forth in the contract and not yet paid: . . ." The builder accepted the order. The Fleet Corporation gave directions to the claimant not to make, and to the builder not to accept from claimant, any further payments on account of the contract.

On August 28, the Fleet Corporation notified the claimant that it had issued to the builder notice of requisition, and inclosed a copy. The letter advised that the Fleet Corporation's district officer had been authorized to take over claimant's inspection officers. It requested a verified statement of the payments made to the builder prior to requisition. It said: "It is the present intention of the corporation to reimburse you promptly, so far as funds are available, for the payments heretofore made to the shipbuilder if . . . such payments are found in order and in conformity with the contract requirements." It re-

quested a statement of indirect expenditures, such as the cost of superintendence, original design and interest on funds already paid, and said that the owner might submit any other matters deemed pertinent; that it presumed that it was addressing those entitled to receive compensation on account of the requisition of the vessels, and asked that there be included in claimant's answer " all evidence of ownership which is necessary to establish the right of those who are entitled to receive the compensation provided by law."

On December 8, 1917, the Fleet Corporation made a contract with the builder and the American International Corporation relating to the completion and disposal of hull #193 and other ships requisitioned. It required the builder to complete the ship " in accordance with the specifications annexed to the respective contracts under which such hulls were being constructed for the former owners prior to August 3, 1917. . . ." It also provided that the Fleet Corporation should have credit for all sums theretofore received by the builder from former owners. The Fleet Corporation agreed to indemnify the builder from all loss or liability arising out of claims of the former owners occasioned by the requisition order, or any subsequent acts or orders.

January 23, 1920, the Fleet Corporation awarded claimant $442,683.82 as just compensation. It paid the builder for construction of the ship $412,130 which, added to the award, makes $854,813.82. This would be the total cost to it of the ship if its award as to compensation were accepted. The contract price was $831,630. The cost of construction for military protection was $31,000. The Court of Claims found that at the time of the requisition, the value of such ships was $200 per deadweight ton, and was the same on February 1, 1918. The Court of Claims also found that claimant had paid to the builder $239,500 in cash, $180,000 in notes, and $28,433.33 interest on notes,

making $447,933.33; and that it also paid architect's fees amounting to $5,500, and furnished plans and specifications of the value of $20,277.25, making in all $473,710.58. The amount of the award was unsatisfactory to claimant, and 75 per cent. of it, $332,012.87, was paid. The judgment was for $231,549.12.[2]

Both parties appeal.

*Did the United States requisition claimant's contract?*

The act of Congress conferred upon the President the power to take claimant's contract; and also to take the ship materials and the ship in process of construction. It required compliance with all orders issued under it. No question is raised or involved as to the obligation of the builder to comply with orders given it to complete the ship in accordance with the contract. It was ordered to do so, and it accepted the order. We are not here concerned with

---

[2] Claimant paid out:

| | |
|---|---:|
| Architect's fees | $5,500.00 |
| Cash to builder | 239,500.00 |
| Notes to builder | 180,000.00 |
| Interest on notes | 28,433.33 |
| Total | $453,433.33 |
| Value of plans and specifications | 20,277.25 |
| | $473,710.58 |
| Less 75 per cent. of award | 332,012.87 |
| Balance | $141,697.71 |

Interest was computed and allowed as follows:

On $473,710.58 minus $28,433.33, or $445,277.25, from August 3, 1917 (date of requisition) to February 24, 1920 (date of payment of 75 per cent. of award), $68,350.06.

On $445,277.25 minus $332,012.87, or $113,264.38, from February 24, 1920, to April 23, 1923 (date of judgment), $21,501.35.

| | |
|---|---:|
| Total of interest | $89,851.41 |
| Added to | 141,697.71 |
| Produces amount of judgment | $231,549.12 |

its rights or obligations, but the orders given the builder show that expropriation of claimant's contract and rights was intended. By its orders the Fleet Corporation put itself in the shoes of claimant and took from claimant and appropriated to the use of the United States all the rights and advantages that an assignee of the contract would have had. The credit for, and advantages under the contract resulting from, payment of $419,500, made by claimant to builder were taken. The use of the plans and specifications for the construction of the ship as well as the benefit of inspection prior to the requisition date, August 3, 1917, were also taken over. The contract was not terminated. The direct and immediate result of the requisition orders and acts of the Fleet Corporation was to take from claimant its contract and its rights thereunder. Because of material ordered and furnished and work performed prior to requisition, the United States was enabled to obtain the ship earlier than it could have caused a like ship to have been planned and built, and secured the benefit of prices prevailing immediately after the making of the contract, when the builder ordered materials for the construction of the ship. At the time of requisition, costs were higher than the contract prices. At that time, and on February 1, 1918, the date fixed for completion, the value of such ships was greatly in excess of the contract price, and in excess of the amount awarded to claimant plus the amount paid by the Fleet Corporation to the builder.

*Omnia Commercial Co.* v. *United States*, 261 U. S. 502, does not support the contention that claimant's contract was not expropriated. There, claimant had a contract giving it an opportunity to purchase a large quantity of steel plate from a steel company at a price under the market. If the contract had been carried out, large profits would have resulted. Before any deliveries were made, the United States requisitioned the steel company's entire production of steel plate. No specific steel plate had been

appropriated to the contract, and no part of the purchase price had been paid. The action taken by the United States applied to the steel company only and created no relations with the claimant. The contract was not kept alive nor resorted to in order to determine anything involved in the transaction between the United States and the steel company; the benefit of the low prices was not taken; no payments made on account of the purchase price were taken; nothing belonging to the Omnia Company was taken. Damages claimed were held too remote. The differences between that case and this are essential and obvious.

The situation in this case is well stated in the dissenting opinion of the Chief Justice of the Court of Claims: " If the plaintiff had voluntarily assigned its contract with the builder to the Government, and the latter had expressly assumed the unfulfilled obligations and later received the completed vessel, it would not more effectively have acquired plaintiff's contract, its rights, and obligations than actually resulted from what was done in this case. The Government requisitioned the incomplete vessel with the purpose of requiring the completion in accordance with the existing contract; it did require the carrying out of that contract (with slight modification); it took plaintiff's right to have the vessel; it received the vessel and appropriated plaintiff's partial payments thereon to its own use and benefit."

It must be held that the claimant's contract, and its rights and interests thereunder, were expropriated.

*Upon what basis is just compensation to be ascertained?*

The expropriation enabled the Fleet Corporation to obtain the ship when completed by paying the builder the instalments of the contract price remaining unpaid at the time of the requisition. The builder was not entitled to more, because the Fleet Corporation took over the contract and succeeded to the rights of claimant.

The award by the Fleet Corporation was made up of two items: one was stated to be the "computed value" of material in the yard of the builder at the time of requisition, and the other the amount of progress payments "in excess of the cost of the materials requisitioned." The Court of Claims held that the materials were not the property of the claimant, but belonged to the builder, and should not have been taken into account in arriving at the compensation due the plaintiff. But we are of opinion that the amount of claimant's compensation did not depend upon the legal title to the materials during construction; that the progress payments did not constitute the amount claimant was entitled to have, and that the award was erroneous, because of failure to find the value of claimant's contract rights taken.

The judgment of the Court of Claims was based upon the assumption that the money paid by claimant in furtherance of planning and building the ship was expropriated. In the opinion, it is said, "And the plaintiff is entitled to recover the amounts of money requisitioned and appropriated by the United States." But plainly there was no requisition of money.

The United States contends that nothing whatever was requisitioned from the plaintiff, and that the judgment should be reversed and the claim dismissed unless claimant shall be held entitled to compensation for cancelation of its contract; and that, in such event, it should have judgment only for an amount sufficient with what already has been paid to it to make up "the amount actually invested in the ship taken."[3] As we hold that claimant's contract rights were expropriated, it is not necessary to consider what would be just compensation in case of mere cancelation of the contract.

_____

[3] The figure contended for is $425,000, made up of $419,500, paid by claimant to builder, and $5,500, architect's fee. Nothing is included to cover the value of plans, interest or cost of inspection.

The contract rights of claimant taken are to be distinguished from its expenditures for the production of the ship. The value of property may be greater or less than its cost; and this is true of contract rights and other intangibles as well as of physical things. It is the property and not the cost of it that is protected by the Fifth Amendment. *Minnesota Rate Cases,* 230 U. S. 352, 454. By the taking, the claimant lost and the United States obtained the right to have the completed ship delivered to it on or before February 1, 1918, upon payment of the instalments remaining to be paid under the contract. It is settled by the decisions of this Court that just compensation is the value of the property taken at the time of the taking. *Vogelstein & Co.* v. *United States,* 262 U. S. 337, 340; *United States* v. *New River Collieries Co.,* 262 U. S. 341, 344; *Seaboard Air Line Ry. Co.* v. *United States,* 261 U. S. 299, 306; *Monongahela Navigation Co.* v. *United States,* 148 U. S. 312, 341. And, if the taking precedes the payment of compensation, the owner is entitled to such addition to the value at the time of the taking as will produce the full equivalent of such value paid contemporaneously. Interest at a proper rate is a good measure of the amount to be added. *Seaboard Air Line Ry. Co.* v. *United States, supra; United States* v. *Benedict,* 261 U. S. 294, 298; *Brown* v. *United States,* 263 U. S. 78.

Claimant insists that just compensation is the value of the contract and its rights and interests thereunder, and is measured by the difference between the value of the ship, as found by the court, at the time of the taking and on the date specified for delivery, and the amount which claimant was then required under the contract to pay in order to get the ship.

We think it not permissible so to calculate compensation. It is the sum which, considering all the circumstances—uncertainties of the war and the rest—probably

could have been obtained for an assignment of the contract and claimant's rights thereunder; that is, the sum that would in all probability result from fair negotiations between an owner who is willing to sell and a purchaser who desires to buy.

*In re Mersey Docks and Admiralty Commissioners,* [1920] 3 K. B. 223, is a case quite similar to this. There, the Admiralty requisitioned a barge nearing completion, altered her construction, and paid, or undertook to pay, the builder the original contract price. It was impossible for the Board, for whom the barge was being constructed, to replace her by another at a cost less than three times the contract price of the original barge. By agreement, the ascertainment of compensation to be paid by the Admiralty to the Board was referred to an arbitrator. The Board claimed the difference between the contract price and cost of replacing the barge, regard being had to the fact that replacement would be impossible for three years; and also claimed compensation for loss of services during the period required for replacement. The Admiralty contended that the measure of compensation should be the difference between the contract price and value of the vessel when taken. A special case was stated by the arbitrator. The Earl of Reading, Lord Chief Justice, gave judgment, and held that the Board was entitled to recover the difference between the contract price and the increased cost of replacing the barge; that the Board was not entitled to any compensation for loss of services, the damage being too remote. He said (p. 233): "On a broad view of the facts and without undue regard to minute details, the Court has to determine upon what principle the compensation to be awarded to the Board ought to be measured. In my judgment it is sufficient for the purpose of this case to say that the Board are entitled to have the property which, but for the action of the Admiralty, would have been in their possession in April, 1917, replaced by

the Admiralty. As it cannot be replaced except by the expenditure of money, they are entitled to the amount of money which will represent the cost to them of the replacement. That must be measured with regard to the special circumstances arising from the war, and more especially to the increase in the value of labour and materials which has continued up to the present time. . . . I can see no very material difference between the respective principles contended for by counsel on behalf of the Board and counsel on behalf of the Admiralty. In truth I think that both these principles lead to the same conclusion."

This Court has held in many cases that replacement cost is to be considered in the ascertainment of value,[4] but that it is not necessarily the sole measure of or guide to value. We are of opinion that value, so far as material, rather than replacement cost should be taken into account, for the ascertainment of just compensation. If the ship had been complete and ready for delivery at the time of requisition, claimant's just compensation would be the value of the ship, less the unpaid balance of the contract price. But the ship was not ready, and the builder was not bound to deliver before February 1, 1918. Claimant had a right to its delivery at that time, and the builder was ready to perform the contract. The Court of Claims, being of opinion that claimant's contract was not taken, did not find its value at the time of taking, and failed to find facts from which such value appears. Determination of just compensation is to be based on the fact that claimant's contract and its rights and interest thereunder were expropriated, and that it is entitled to have their value at the time of the taking. The value of

---

[4] *Southwestern Bell Telephone Co.* v. *Public Service Commission,* 262 U. S. 276, 287, and cases cited; *Bluefield Co.* v. *Public Service Commission,* 262 U. S. 679, 689; *Georgia Ry. & Power Co.* v. *Railroad Commission,* 262 U. S. 625, 629.

such ships at the time of requisition, and the then probable value at the time fixed for delivery, the contract price, the payments made and to be made, the time to elapse before completion and delivery, the possibility that by reason of the Government's action in control of materials, etc., the contractor might not be able to complete the ship at the date fixed for performance, the loss of use of money to be sustained, the amount of other expenditures to be made between the time of requisition and delivery, together with other pertinent facts, are to be taken into account and given proper weight to determine the amount claimant lost by the taking (*Minnesota Rate Cases, supra,* 451; *United States* v. *Chandler-Dunbar Co.,* 229 U. S. 53, 76; *Boston Chamber of Commerce* v. *Boston,* 217 U. S. 189, 195; *Monongahela Navigation Co.* v. *United States, supra,* 343), that is, the sum which will put it in as good a position pecuniarily as it would have been in if its property had not been taken.   *United States* v. *New River Collieries Co., supra,* 343; *Seaboard Air Line Ry. Co.* v. *United States, supra,* 305.

*Reversed and remanded for further proceedings in conformity with this opinion.*

Mr. Justice Sutherland took no part in the consideration of this case.

The separate opinion of Mr. Justice McReynolds.

This case is of special importance because of the immense sums involved in similar pending claims.   Ten ships—some larger than No. 193—were requisitioned at Camden alone.   Speaking with constraint, the findings of the Court of Claims leave much to be desired for ready understanding; but enough appears, I think, to support its final judgment.

Through change of name, the Brooks-Scanlon Corporation became successor to Carpenter-O'Brien Company and

party to the written contract of March 28, 1916, under which the New York Shipbuilding Corporation undertook to construct at its Camden yard a steamship of about eighty-five hundred tons (Freighter No. 193), according to designated plans, on or before February 1, 1918. $595,000, payable in installments, was the price first stated; prior to May 25, 1917, because of changes, this was increased to $811,130. The East Coast Transportation Company and the New York Shipbuilding Company were the original contracting parties. The Brooks-Scanlon Corporation acquired the former's interests—the New York Shipbuilding Corporation those of the latter.

The Act of Congress approved June 15, 1917, c. 29, 40 Stat. 182, provides: " The President is hereby authorized and empowered, within the limits of the amounts herein authorized—

"(a) To place an order with any person for such ships or material as the necessities of the Government, to be determined by the President, may require during the period of the war and which are of the nature, kind and quantity usually produced or capable of being produced by such person.   (b) To modify, suspend, cancel, or requisition any existing or future contract for the building, production, or purchase of ships or material.   (c) To require the owner or occupier of any plant in which ships or materials are built or produced to place at the disposal of the United States the whole or any part of the output of such plant, to deliver such output or part thereof in such quantities and at such times as may be specified in the order.   (d) To requisition and take over for use or operation by the United States any plant, or any part thereof without taking possession of the entire plant, whether the United States has or has not any contract or agreement with the owner or occupier of such plant.   (e) To purchase, requisition, or take over the title to, or the possession of, for use or operation by the United States any ship now con-

structed or in the process of construction or hereafter constructed, or any part thereof, or charter of such ship.

" Compliance with all orders issued hereunder shall be obligatory on any person to whom such order is given, and such order shall take precedence over all other orders and contracts placed with such person. . . .

" Whenever the United States shall cancel, modify, suspend or requisition any contract, make use of, assume, occupy, requisition, acquire or take over any plant or part thereof, or any ship, charter, or material, in accordance with the provisions hereof, it shall make just compensation therefor, to be determined by the President; and if the amount thereof, so determined by the President, is unsatisfactory to the person entitled to receive the same, such person shall be paid seventy-five per centum of the amount so determined by the President and shall be entitled to sue the United States to recover such further sum as, added to said seventy-five per centum, will make up such amount as will be just compensation therefor, in the manner provided for by section twenty-four, paragraph twenty, and section one hundred and forty-five of the Judicial Code. . . .            .

" The cost of purchasing, requisitioning, or otherwise acquiring plants, material, charters, or ships now constructed or in the course of construction and the expediting of construction of ships thus under construction shall not exceed the sum of $250,000,000, exclusive of the cost of ships turned over to the Army and Navy. . . ."

July 11, 1917, the President delegated his powers granted by the statute, to the United States Shipping Board Emergency Fleet Corporation—the " Fleet Corporation." Purporting to act as thus authorized, and referring to ten vessels then under construction at the Camden Yard, the Fleet Corporation notified the New York Shipbuilding Corporation, August 3, 1917: "All power-driven cargo-carrying, and passenger ships above

2,500 tons d. w. capacity, under construction in your yard, and certain materials, machinery, equipment, outfit, and commitments for materials, machinery, equipment, and outfit necessary for their completion are hereby requisitioned by the United States.  On behalf of the United States, by virtue of said act and said order, you are hereby required to complete the construction of said requisitioned ships under construction and will prosecute such work with all practicable dispatch.  The compensation to be paid will be determined hereafter and will include ships, material, and contracts requisitioned.  You will furnish immediately general plans and detail specifications of the ships requisitioned, and copies of contracts and all supplemental agreements in relation thereto, and full particulars as to owner, date of completion, payments made to date, amounts still due, and any other information necessary to a fair and just determination of the obligations of the Emergency Fleet Corporation in taking over these ships and contracts.  You will report immediately whether any additional contracts are under consideration and their character and extent, and will not enter into any additional contracts or commitments with respect to merchant tonnage without express authority from this corporation."

August 18, 1917, the Fleet Corporation addressed a letter to the East Coast Transportation Company (predecessor of Brooks-Scanlon Corporation) giving notice of the requisition-order of August 3rd, and on August 28, 1917, served on the Carpenter-O'Brien Company a substantially identical letter, which stated—

"On August 3, 1917, the United States Emergency Fleet Corporation issued to the New York Shipbuilding Corporation the notice or requisition set forth in enclosure 'a'.

"In response to this communication the New York Shipbuilding Corporation, the shipbuilders, informed us

that the East Coast Transportation Company, as owners, or representatives of owners, had entered into a contract with them for the following vessel:

"Hull No. 193; type, cargo; d. w. ton, 8,100; date of contract, 3–28–16 (assigned 5–24–17).

"Under date of August 23rd you advised that this contract had been assigned to you.

"The corporation's district officer having charge of vessels in the district in which the shipbuilders are located has been instructed to take charge, for the corporation, of the completion of vessels now under construction, and has been authorized temporarily to take over your local inspecting officers at their present compensation. Will you please inform the district officer, Mr. G. R. McDermott, at room 302, 1319 F St. N. W., Washington, D. C., the names of your representatives and their compensation, sending a duplicate to this office. Your cooperation with the corporation is invited.

"The corporation will consider payments to the contractor accruing since the date of requisition, upon the receipt of proper vouchers and adequate information to be forwarded through its district officers.

"You are requested, as soon as possible, to report to the corporation a statement in detail of the payments already made by you on each ship named above prior to the date of the requisitioning, August 3, 1917. This statement should be accompanied by the original vouchers and receipts and should be verified under oath by the proper corporate officer of your company.

"It is the present intention of the corporation to reimburse you promptly, so far as funds are available, for the payments heretofore made to the shipbuilder if after investigation of data submitted by you such payments are found in order and in conformity with the contract requirements.

"At your further and early convenience you are requested to submit to the corporation a statement of such

indirect expenditures as you have made on account of each vessel; for instance, the cost of superintendence, original design, interest on funds already paid, and the like. The matters mentioned will require careful audit, and in addition you may submit any other matters you deem pertinent.

" It will be perceived that the corporation presumes it is addressing this letter to the owners, or responsible representatives of the owners, or persons entitled to receive compensation on account of the requisition of the vessels listed above. The corporation requests that there be included in your response to this letter all evidence of ownership which is necessary to establish the right of those who are entitled to receive the compensation provided by law.

" The consummation of the orders herein and heretofore transmitted will be made the subject of later appropriate corporate action."

August 22, 1917, the Fleet Corporation, through General Manager Capps, forwarded the following letter to Agent McDermott; and, as directed, the latter promptly delivered a copy thereof to the New York Shipbuilding Corporation with request that it govern itself accordingly. " Dear Sir:

" Referring to the vessels under construction in the yard of New York Shipbuilding Corporation, Camden, N. J., requisitioned under the corporation's order of August 3rd, precedent to the final examination of the contract for the vessels in question, you are requested to inform the shipbuilder as follows:

" The ships now under construction at your plant and referred to above having been requisitioned by the duly authorized order of this corporation and title thereto taken over by the United States, and an order having been placed with you by due authority to complete the construction of said ships with all practicable dispatch, you

are further ordered by the President of the United States, represented by this corporation, to proceed in the work of completion heretofore ordered, in conformity with the requirements of the contract, plans, and specifications under which construction proceeded prior to the requisition of August 3, 1917, in so far as the said contract describes the ship, the materials, machinery, equipment, outfit, workmanship, insurance, classification and survey thereof, including the meeting of the requirements of the said contract and all tests as to efficiency and capacity of the ship on completion, and in so far as the contract contains provisions for the benefit and protection of the person with whom the contract was made, but not otherwise.

"All work will proceed under the inspection of such persons as have been or may hereafter, from time to time, be designated by this corporation for that purpose.

"For the work of completion heretofore and herein ordered the corporation will pay to you amounts equal to payments set forth in the contract and not yet paid: Provided, That on acceptance in writing of this order you agree that on final acceptance of the vessel to give a bill of sale to the United States in satisfactory form, conveying all your right, title, and interest in the vessel, together with your certificate that the vessel is free from liens, claims or equities, with the exception of those of the owner, and then only to those set forth in the contract. Compensation to the shipbuilder for expedition and for extra work will, when deemed appropriate, be made the subject of a subsequent order.

"This order applies only to vessels actually under construction and in accepting it the corporation expects you to inform it of the actual stage of construction of each vessel or the part to be assembled therein on the date of requisitioning, August 3, 1917. The corporation reserves the right to decide whether or not a vessel was actually under construction on August 3, 1917, on consideration of the ascertained facts.

" In replying to this communication, please arrange to
specify separately the vessels to which this order refers,
and refer to the corresponding contract in sufficient terms
for identification of it.

" Please furnish a copy of this to New York Shipbuild-
ing Corp., and ask for an early reply.

Very truly yours,

W. L. CAPPS, General Manager."

Replying, September 20, 1917, the Shipbuilding Cor-
poration advised the Emergency Fleet Corporation—

" Referring to the order dated August 22, 1917, made by
United States Shipping Board Emergency Fleet Corpora-
tion, and delivered to this company, we beg to say:

" We understand that by the Act of Congress of June
15, 1917, entitled 'An Act making appropriations for the
Military and Naval Establishments on account of war ex-
penses for the fiscal year ending June 30, 1917, and for
other purposes,' and the Executive order dated July 11,
1917, made by the President with respect to said act, and
transmitted to us by the Emergency Fleet Corporation
under date of August 3, 1917, we are under obligation to
comply with the order of the Emergency Fleet Corpora-
tion dated August 3, 1917, requisitioning ships at this com-
pany's plant.

" This corporation, therefore, accepts United States
Shipping Board Emergency Fleet Corporation's order
dated August 22, 1917, for the completion of the vessels
under contract in this yard on August 3rd, 1917, known as
hull No. —, and agrees that, upon the completion and ac-
ceptance of said vessels and upon complete payment [by]
United States Shipping Board Emergency Fleet Corpora-
tion, together with such additional compensation as may
be agreed upon, this company will execute and deliver to
the United States of America a bill of sale conveying all
this company's right, title, and interest in the vessels with-
out prejudice to any claim of the person or corporation

who originally contracted for the construction of said vessels, and those claiming rights under such original contractor, together with our certificate that the vessels are free from liens, claims, or equities except such liens, claims, or equities as may be asserted by, or exist in favor of, the person or corporation who originally contracted for the construction of the vessels, and those claiming rights under such original contractor."

September 13, 1917, the Fleet Corporation telegraphed the Shipbuilding Corporation: "Do not accept further payment from former owners on account of requisitioned ships. This is mandatory."

December 8, 1917, the Shipbuilding Corporation and the Fleet Corporation agreed—

"On and prior to August 3, 1917, the Shipbuilding Corporation was constructing under private contract with the corporations named below (hereinafter called 'former owners') ships bearing the hull numbers of the type and for the contract prices set opposite their respective names. . . . [There were 10 of them.]

"Due to war conditions, such contract prices have proved and will prove to be less than the actual cost of constructing such ships. On August 3, 1917, all of such ships, together with the materials assembled therefor, were requisitioned by the Fleet Corporation, acting in accordance with the provisions of the Urgent Deficiency Act of June 15, 1917, and the Executive order of July 11, 1917. The Shipbuilding Corporation by such requisition was directed to complete such ships on behalf of the United States.

"The parties hereto desire to fix the just compensation to be paid to the Shipbuilding Corporation in accordance with the provisions of such Urgent Deficiency Act, and to that end the Fleet Corporation is willing to increase such contract prices. . . .

"The Fleet Corporation hereby agrees to pay to the Shipbuilding Corporation as just compensation for the

completion of said ten ships, hulls Nos. . . . the entire cost of construction of said ships, figured from the commencement by the Shipbuilding Corporation of the construction of said ten ships up to the times of comple-. tion thereof respectively, and in addition thereto with respect to each ship ten dollars ($10) per dead-weight ton for profit. There shall be credited, however, in favor of the Fleet Corporation all sums heretofore received by the Shipbuilding Corporation on account of the construction of such ten ships respectively, either from the former owners or from the Fleet Corporation."

The amended petition, filed June 12, 1920—prior to our decision of *Omnia Commercial Co.* v. *United States,* 261 U. S. 502, 513—and upon which the cause was tried, alleges—

"That said builder, the New York Shipbuilding Company, had, up to the 3d day of August, 1917, duly contracted for all of the materials, equipment and supplies sufficient to complete said ship as specified in said contract, and that a large portion of such material, equipment and supplies had been duly prepared and delivered to the yard of said builder on said day, and that the remainder thereof, sufficient to complete said ship, had been duly contracted for by said builder and was, thereafter, delivered under the provisions of said contracts, and entered into the construction and completion of said ship; and that said builder had performed and caused to be performed a large amount of labor under said contract upon, in and about the construction of said ship, and that said builder had duly paid for said contracts for material, equipment and supplies, the delivery thereof, and for the labor furnished and performed in and about such construction by moneys so paid to said builder by said owner as herein stated; and that said builder, on the 3d day of August, 1917, on its part, had fully complied with the terms of said contract, and was then and was always thereafter

ready, able and willing to complete the same in all
particulars: . . .

"That on June 15, 1917, by Chapter 29, 40th Statutes
at Large, 182, Congress authorized the President, among
other things to modify, suspend and cancel or requisition
any existing or future contract for the building, pro-
duction or purchase of ships or materials, etc., and further
to purchase, requisition or take over the title to or the
possession of, for use or operation by the United States,
any ship then constructed or in the process of construc-
tion, or thereafter constructed, or any part thereof, or the
charter of said ship.   In further accordance with said act
the President, by order dated July 11, 1917, deputed to
the United States Shipping Board Emergency Fleet Cor-
poration full power to act thereunder including the power
to provide just compensation therefor, and the said cor-
poration, by its order of August 3, 1917, on behalf of the
United States, took over all the property of the claimant
in or under said contract, including the said ship under
construction and all materials, machinery, equipment,
outfit and commitments therefor, and all labor performed
thereon necessary for its completion, meaning thereby
everything in existence and as expressed in said order ' re-
quired to complete the construction of said requisitioned
ships under construction,' as will more fully appear by
reference to the order of W. L. Capps, General Manager,
which reads as follows.   [Here follows copy of requisition-
notice to the Shipbuilding Corporation dated August 3rd
and enclosed in letter of August 28th addressed to Car-
penter-O'Brien Company.] . . .

"That said requisition order was fully complied with
and all of the property of said owner, the claimant herein,
hereinbefore described, was taken by the said United
States Shipping Board Emergency Fleet Corporation for
and on behalf of the United States, and was thereafter re-
tained by and used for the purposes of the United States

as provided by law. And that the said owner was thereby and thereafter deprived of all of its use and value. That said ship so taken was then under construction by said builder and thereafter was fully completed without change of plans or specifications from those set forth in the said construction contract as amended and supplemented, and that the said materials, equipment, outfit and supplies, and the said commitments and contracts for materials, equipment, outfit and supplies as described in said requisition order and paid for by the said owner and taken as aforesaid, were actually used in the construction and completion of said ship and were substantially sufficient to so construct, complete, equip and supply said ship as described in said plans and specifications as amended and supplemented. . . .

" That a fair and reasonable value of the said property so requisitioned and taken, and of which said owner was deprived on said 3d day of August, 1917, as aforesaid, was, at the rate of two hundred fifty dollars ($250) per ton for 8,597 dead weight tons, the sum of two million, one hundred forty-nine thousand, two hundred fifty dollars ($2,-149,250) less the sum of four hundred twelve thousand, one hundred thirty dollars ($412,130) as aforesaid, (required to be paid by said owner to said builder under the provisions of said construction contract as amended and supplemented, in order to fully complete, supply and equip said ship in accordance with the terms and conditions of said construction contracts hereinbefore set forth), so that the total amount due to said claimant on the said 3d day of August, 1917, on account of the transactions hereinbefore set forth was the sum of one million, seven hundred thirty-seven thousand, one hundred twenty dollars ($1,737,120)."

The ship was finally completed and delivered September 20, 1918.

Departing from the theory of the complaint, petitioner now maintains that its right and interest in the shipbuild-

ing contract were expropriated by the United States for public use; that the contract itself was requisitioned, not frustrated; and that compensation must be made for the full value of the contract as of the date when so taken. The Court of Claims denied this demand, but held petitioner should receive the sum of partial payments which it made to the shipbuilder under the contract prior to the ·requisition order of August 3, 1917, with interest.

I can find no sufficient basis for holding that the Fleet Corporation expropriated the claimant's contract or intended so to do, or consciously assumed liability for the value thereof. Claimant never had either title to or possession of the vessel. It was only a responsible party to an executory contract for construction, always subject to frustration by condemnation of the vessel.

The order of August 3rd, addressed only to the Shipbuilding Corporation, plainly recites that " all power-driven cargo-carrying, and passenger ships above 2,500 tons d. w. capacity, under construction in your yard, and certain materials, machinery, equipment, outfit, and commitments for materials, machinery, equipment, and outfit necessary for their completion are hereby requisitioned by the United States." On that date the Shipbuilding Corporation had possession of the ship as well as title thereto. The United States then assumed control and the immediate result was to frustrate the building contract. Frustration by the exercise of the power of eminent· domain was an implied condition. The United States became liable to the owner—the Shipbuilding Corporation—for the value of property actually taken. What that value was we need not inquire; the builder accepted the requisition-order and the agreement of December 8th, and does not now seek to recover more.

Certainly, no notice concerning requisition went to the Brooks-Scanlon Corporation prior to the letters of August 18th and 28th, whereas the building contract had been frustrated by taking the ship on August 3rd.

The communication of August 22nd to the Shipbuilding Corporation referred· to the vessels in the yard as having been "requisitioned under the corporation's order of August 3rd, precedent to the final examination of the contract for the vessels in question," and "title thereto taken over by the United States"; directed their completion in conformity with contract, etc., which existed on that date; and stated that "for the work of completion heretofore and herein ordered the corporation will pay to you amounts equal to payments set forth in the contract and not yet paid," with a certain important proviso.

On September 20th the Shipbuilding Corporation recognized that the ship had been requisitioned by the order of August 3rd and promised to complete upon payment of compensation named in original contract and "such additional compensation as may be agreed upon."

The telegram of September 13th referred to "requisitioned ships." The contract of December 8th recites that "on August 3, 1917, all of such ships, together with the materials assembled therefor, were requisitioned by the Fleet Corporation."

The notices addressed to East Coast Transportation Company and Carpenter-O'Brien Company, August 18th and 28th, indicate that on August 3rd the Fleet Corporation was unaware of the parties to or the terms of the building contract. These notices declared a purpose to "consider payments to the contractor accruing since the date of requisition," and an intention "to reimburse you promptly, so far as funds are available, for the payments heretofore made to the shipbuilder;" and further, "it will be perceived that the corporation presumes it is addressing this letter to the owners, or responsible representatives of the owners, or persons entitled to receive compensation on account of the requisition of the vessels listed above."

The reported facts seem inconsistent with any definite purpose by the Fleet Corporation to requisition the con-

tract, as distinguished from the vessel itself—certainly, there was no apparent reason for any such action. It expressed a purpose to reimburse for payments made under the building contract and to consider such sums when seeking to determine compensation for the shipbuilder. It also demanded that the builder should complete the vessel as provided by the contract. The builder acquiesced, and its rights are not now in controversy. The right of the claimant to reimbursement for the actual payments which it made under the contract prior to frustration is not challenged; it was properly considered in adjusting the sums to be paid to all parties. I can see no sufficient reason for awarding the value of a contract which perhaps might have been realized if the United States had not exercised their clear right to take over the partially completed vessel. No such claim was advanced by the petition; there was ample power in the Fleet Corporation to frustrate the building contract; and there seems no necessity for interpreting its action as accomplishing more. The Fleet Corporation evidently intended to requisition the vessel; and when claimant filed its petition in 1920 it does not seem to have thought the contract had been requisitioned. A few vague and general words used in the hurry of the times and without full information ought not to place an enormous, wholly unnecessary and unanticipated burden on the public treasury.

The amended petition upon which the cause was tried proceeds upon the theory that claimant was *owner* of the vessel; that prior to August 3, 1917, the builder had duly contracted for all necessary material and supplies to complete the ship, performed much labor thereon, and had paid for all these things out of moneys received from the *owner*. It distinctly alleges: That the Fleet Corporation, "by its order of August 3, 1917, on behalf of the United States, took over all the property of the claimant in or under said contract, including the said ship under con-

struction and all materials, machinery, equipment, outfit and commitments therefor, and all labor performed thereon necessary for its completion, meaning thereby everything in existence and as expressed in said order 'required to complete the construction of said requisitioned ships under construction.' . . . That said requisition order was fully complied with and all of the property of said owner, the claimant herein, hereinbefore described, was taken by the said United States Shipping Board Emergency Fleet Corporation for and on behalf of the United States, and was thereafter retained by and used for the purposes of the United States as provided by law."

The court below—rightly, I think—declared: "The intent and purpose of the Shipping Board was, therefore, to requisition ships under construction, which was done in unmistakable language. It is admitted that the ships under construction, the materials, and so forth in the yard of the New York Shipbuilding Corporation were the property of that corporation, and the title to that property was in the Shipbuilding Corporation alone. Among the ships under construction so requisitioned was hull 193, which the Shipbuilding Corporation was building for the Carpenter-O'Brien Corporation, but it is not contended by the plaintiff that it had any title to or interest in said ship or the materials for its completion. All the interest it had was the right to the delivery of the ship when it should be completed. It follows that the United States did not take or requisition the ship or materials from the Carpenter-O'Brien Corporation nor did the United States take over or requisition the contract which the Carpenter-O'Brien Corporation had with the Shipbuilding Corporation.

"It was made plain to the Carpenter-O'Brien Corporation that the United States did not intend to requisition the contract, for on August 28, 1917, after notifying the

Carpenter-O'Brien Corporation that it had taken over and requisitioned this ship from the Shipbuilding Corporation, the Shipping Board by letter of that date stated what its intention was.  A copy of said letter is set forth in full in Finding VI.  As further evidence showing the intention of the Shipping Board, reference is made to the letter of the board to G. R. McDermott, its officer, and which was communicated to the Shipbuilding Corporation.  A copy of this letter is set forth in Finding VIII.  And as final evidence that the United States did not requisition the contract, and never intended to, the United States entered into a contract with the Shipbuilding Corporation for the completion of all ships under construction in its yard, included in which ships was hull 193, thereby making its own contract for the completion of this ship. This contract is set out in Finding XVI.  It is true that the plaintiff by reason of the requisitioning of the ship by the United States was deprived of the right to have delivered to it the ship when completed.

" But there has been in this case no direct taking of the contract.  The injury inflicted upon the plaintiff is a consequential injury resulting from the exercise of a lawful power in the requisitioning of the ship under construction.  The requisitioning has worked indirectly harm and loss to the plaintiff, but not such harm and loss as can be held to obligate the Government to pay for it. The action of the Government may have destroyed the worth of the contract, but the law affords no remedy. The Government by requisitioning the subject matter of the contract does not thereby take the contract.  The subject matter in this case was the ship under construction, and that was what the Government requisitioned, not the contract which was the agreement and obligation to perform.  The performance of the contract in this case was frustrated and not appropriated.  'Frustration and appropriation are essentially different things.'  *Omnia Commercial Company* v. *United States,"* *supra.*

The principles involved have been so recently discussed in *Omnia Commercial Co.* v. *United States,* that it seems unnecessary to restate them. We there said: " In the present case the effect of the requisition was to bring the contract to an end, not to keep it alive for the use of the Government. The Government took over during the war railroads, steel mills, ship yards, telephone and telegraph lines, the capacity output of factories and other producing activities. If appellant's contention is sound the Government thereby took and became liable to pay for an appalling number of existing contracts for future service or delivery, the performance of which its action made impossible. This is inadmissible. Frustration and appropriation are essentially different things."

The evidence fails to show any definite purpose by the Fleet Corporation to requisition the contract. Up to the time of instituting suit the claimant evidently was unaware of any such requisition. And it seems to me clear enough that the court below rightly concluded that the demand now advanced is without merit.

MR. JUSTICE SANFORD concurs in this opinion.