WALTER LANGDON, Respondent, *v.* THE MAYOR, ALDERMEN AND COMMONALTY OF THE CITY OF NEW YORK, Appellant.

MARIAN L. CARROLL (nee LANGDON) et al., Respondents, *v.* THE SAME, Appellant.

In an action to recover damages sustained by plaintiff by reason of the erection by the city of New York of a new wharf or bulkhead in front of plaintiff's wharf on the Hudson river, in pursuance of the plan for a new front along that river, adopted by the city under authority of the act of 1870 (§ 99, chap. 137, Laws of 1870), as amended in 1871 (Chap. 574, Laws of 1871), thus cutting off access by vessels to said wharf, plaintiff was permitted to prove under objection and exception the prices paid by the city, in carrying out its plan, for other property of the same general character and similarly situated upon the same river front. *Held,* no error; that in view of the peculiar and exceptional character of the situation, plaintiff having no ownership of the fee of the premises where defendants' wrongful acts were committed, but simply owning certain rights and easements similar to those existing along the whole river front, the reception of this testimony was not such error as to require reversal; that the evidence was the best obtainable, and so, a departure from the ordinary rule, which will not allow evidence of sales of other real property in the same vicinity to be given for the purpose of establishing the value of property in controversy, was permissible.

*In re Thompson* (127 N. Y. 463), distinguished,

(Argued March 3, 1892; decided May 24, 1892.)

APPEALS from judgments of the General Term of the Supreme Court in the first judicial department, entered upon orders made June 26, 1891, which confirmed the reports of a referee and directed judgments in favor of plaintiffs.

The following is the opinion in full:

"Upon the trial of these actions at Special Term, all the material facts, except the amount of damages and the value of the plaintiffs' rights, were stipulated, and it was agreed that if the court should decide the plaintiffs were entitled to judgment for the relief demanded in the complaint, the question of the amount of damages and of the value of plaintiffs' interest in the premises should be reserved, and be thereafter ascertained in such legal manner as the court might direct.

"The trial court held that no property rights of the plaintiffs had been invaded by the defendants, and directed judgment

for a dismissal of the complaint in each case upon the merits. The General Term reversed these judgments and ordered a new trial. The defendants thereupon appealed to this court and gave the usual statutory stipulation for judgment absolute, if the orders granting a new trial should be affirmed.

"The decision of this court upon that appeal was favorable to the plaintiffs (93 N. Y. 129) and conclusively determined the extent of their rights, and directed judgment absolute against the defendants. When the remittitur went down, the usual formal order was entered making the judgment of this court the judgment of the Supreme Court and directing that execution might issue for the plaintiffs' costs, when taxed and inserted in the judgment, and for such other amount as the court might adjudge to be recoverable against the defendants. Subsequently, upon the motion of the plaintiffs made at General Term upon the stipulation of the parties, a judgment was entered fixing the rights of the plaintiffs, and ordering a reference to take proofs as to the value of the property appropriated by the defendants, and the amount of past damages, and to report the testimony taken with a statement of the facts deemed to have been proven, and reserving all other questions until the coming in of the report, when either party might apply for further relief at the foot of the judgment.

"This practice was authorized by the concluding paragraph of section 194 of the Code, which provides that when judgment absolute has been ordered in this court and the remittitur sent down, an assessment of damages, or any other proceeding requisite to render the judgment effectual, may be had in the court below. The referee reported the testimony, with his opinion that the value of the property appearing therefrom to have been taken by the defendants in each case was $75,062, or $1,000 per lineal foot of bulkhead, and that the past damages in the one case amounted to $42,998, and in the other case to $36,693. This report was set aside and a new reference ordered upon the ground stated in the opinion at the General Term, that the referee had improperly taken into consideration the benefits which might accrue from the erection of platforms and sheds by the permission of the dock department, under chapter 249 of the Laws of 1875. As the grant-

ing of such privileges was entirely discretionary and highly improbable after the adoption of the plan for the improvement of the river front reported by General McClellan, engineer-in-chief of the department in 1871, they were no longer to be regarded as a lawful element of value or of damages. A second reference was interrupted by the death of the referee, and a third referee appointed, who was authorized to take proofs and report as to the same facts, and upon the hearing either party was to be at liberty to read the testimony of any witness examined upon the former references, or to call any such witness for further examination, and to read any documentary evidence offered on the previous hearings, and any testimony or evidence so offered should be subject to any legal objection thereto upon any other ground than the absence of the witness, or of the original documents offered.

" The referee reported the testimony taken, with his findings to the effect that the value of the plaintiffs' property in each case, at the time of its appropriation, was $7,506, or at the rate of $100 for each lineal foot of water front, and its annual income value $375. Interest upon the value of the property was allowed by way of damages.

" The testimony of the witnesses upon the question of value was widely variant, and proceeded upon irreconcilable lines of difference. Upon the part of the plaintiffs, they were persons more or less familiar with the former market and rental value of this kind of property, and they testified, after an exhaustive examination as to their qualifications and the grounds of their opinions, that, in their judgment, its market value in 1877, at the time of its appropriation by the defendants, ranged from $865 to $1,500 per foot, and its annual rental value from $46 to $50 per foot. These estimates of value did not include any increase on account of platforms or sheds erected, or for the erection of which permission might be obtained from the dock department, under the ' Shed Act ' of 1875, but did include the possibility of the exclusive use of the bulkheads in connection with the adjoining piers by steamship companies under the act of 1858.

" The evidence on the part of the defendants was mainly confined to the amount of wharfage actually collected for the

use of plaintiffs' property at and immediately preceding the time of its appropriation by the defendants, and the estimate of witnesses of the annual income to be derived from it, and it was this testimony which was adopted and followed by the referee in arriving at his conclusions upon the subject of value.

"The application of this rule limited the consideration of the question to the actual present productiveness of the property, which might be dependent upon a variety of causes, not affecting its intrinsic value, and which did not, therefore, afford a safe or reliable criterion of its worth to the owner. If the sovereign power, in the exercise of the right of eminent domain, could take the property of the citizen at a valuation based upon the net income realized from it, it is feared that a very large part of the farm property of the state could be acquired by it at a purely nominal consideration. But it is the potentialities of a given piece of property, both developed and undeveloped, which constitute its chief element of value.

" The General Term took this view of the evidence, when the report of the referee came up for confirmation, and, while not willing to adopt the opinion of plaintiffs' witnesses, and characterizing it as a 'greatly exaggerated estimate of the value of these privileges,' it also discarded the evidence of the defendants, and declared that their estimate of value ' was, on the other hand, ridiculously small.'

" The court then called attention to evidence offered and excluded, which might have afforded a fair ground upon which to base a correct judgment. This rejected evidence consisted of a report of the dock department showing that the defendants had bought other property of a similar character at various places upon the North river front, and paid therefor prices averaging about $600 per lineal foot of front. Because of the exclusion of this proof, the court set aside the report of the referee and directed a further hearing before him for the introduction of additional testimony, upon which a judgment might be rendered. Upon this hearing, the principal evidence introduced consisted of six contracts and deeds for the purchase by the city, in 1884 and 1885, of as many different wharfage and bulkhead rights fronting on West street, and distant about 2,700 feet from the property of the plaintiffs; and of the

report of the commissioners of the dock department of the purchases and the prices paid; and of the testimony of an expert witness that the relative value of such rights and bulkheads and of the plaintiffs were the same.

"The defendants strenuously objected to the reception of this evidence and moved to set aside the referee's report, because of its admission, which was denied, and it is, the exceptions to the admission of this testimony which are the sole grounds for this appeal. The referee reported the value of the property, as found by him, to be $45,037, or $600 per lineal foot, with interest by way of damages to the amount of $32,262, making a total of $77,299 in each case, for which the court awarded final judgment. Preliminary to the judgment an order was entered overruling the defendants' exceptions to the referee's report, and ratifying and confirming the report and directing judgment for the plaintiffs upon the valuations of the property as found by the referee. The defendants appeal from the judgment and give notice that they intend also to bring up this order for review.

"It is insisted by the respondents that the appellant's exceptions to the admissibility of evidence before the referee cannot be heard or reviewed upon this appeal, for the reason that the referee had no power to pass upon the objections made by the defendants when the evidence was offered and the exceptions taken.

"It is not entirely clear what powers the referee possessed in this case. The order of reference provides that testimony offered before the referee should be subject to any legal objection thereto, but it is uncertain whether this provision was intended to confer upon the referee the power to rule upon the objections made, or simply to enter them in his minutes and report them, with the testimony taken, to the court, which would determine their force and validity upon the final application for judgment. The order of reference was also ambiguous in not clearly stating whether the testimony which was to be taken by the referee, subject to objection, included all that might be offered, or only such as might be additional to the testimony taken before the former referees. But these difficulties seem to have all been eliminated from the case by

the practical construction which both parties have put upon these orders of reference and the proceedings under them. From the outset the reference was apparently treated as one under which the referee had power not only to take and report the testimony, but also to find and report the facts which, in his judgment, the evidence established. The referee evidently so regarded his authority, as is shown by the conduct of the hearing, the form of the report, and the able and elaborate opinion rendered by him, in which the force and bearing of the testimony and the various legal propositions involved, are fully considered and discussed. Both parties submitted to him for decision various objections to the admission or rejection of evidence offered, and excepted to his rulings thereon, and both filed exceptions to his report and acquiesced in the authority which he assumed to exercise, without protest, and we think it is now too late for either to be heard to say that the exceptions thus taken, are not properly in the record and before this court for review. It is true, the report was in no sense final or conclusive as an adjudication. It could be set aside by the court to which it was made and the defendants did move seasonably to have it vacated upon the exceptions filed, and especially, upon the ground of the admission of the evidence objected to.

"The question, however, litigated before the referee was the value of the property of plaintiffs, which had been appropriated or destroyed by the acts of the defendants. His finding upon this disputed fact was confirmed by the court and made the basis of its judgment, and if any material errors were committed in the processes by which he arrived at his conclusions, and they have not been waived, no technical objections should prevail to defeat their review and correction by this court.

"The parties have also by a stipulation made at an early day in the history of the case, waived all objections which do not go to the merits, and provided that 'what the rights of the parties to this action are and whether the plaintiff is entitled to damages, and upon what principles they shall be determined, shall at all stages be open to discussion and decision.'

" We are thus brought to the consideration and determination of the question, pressed with so much earnestness and ability by the counsel for the appellants, whether the recovery in this action was not based upon illegal evidence of the value of the property taken by the defendants. For the purposes of this discussion it may be assumed that the only proof of market value, which was considered by the court, was that given upon the supplemental reference and related solely to the purchases made by the defendants of other parties of property of the same general character and similarly situated upon the same river front. The question whether such evidence was properly admitted is not free from difficulty, and, in the form in which it is here presented, is a novel one. But we think that, in view of the peculiar and exceptional character of the situation of this case as developed upon the hearing, its admission was not such error as to require a reversal of the judgment.

" The plaintiffs had no ownership of the fee of the premises where the defendants' wrongful acts were committed, and no visible or tangible property, the extent of which could be measure, defined or described; but they had acquired by grant from the state and the municipality certain valuable incorporeal rights and easements, for the destruction of which the defendants must make compensation.

" It is to be inferred from the proofs in these cases, that rights and easements of a similar character existed along nearly the entire river frontage of the city. The profits from their enjoyment were derived from the tribute which they levied upon the commerce of the port of New York. The privileges which they afforded for the lading and unloading of outgoing and incoming vessels were presumably common to the public to such an extent that the first ship owner applying for the use of a vacant wharf by a vessel arriving or about to arrive, would be entitled to its occupancy upon the payment of the established rate of wharfage. Vessels belonging to the regular lines of transportation might thus be frequently required to wait until other crafts, but occasionally visiting the port and of less importance to its commerce, had been accommodated. To meet this exigency the legislature enacted chapter 261 of

the Laws of 1858, which authorized any wharf owner upon the North river to lease his wharf to the proprietors of any steamboat lines running to and from the city, and that when so leased it should be reserved for the exclusive use and occupancy of the lessee. This court had occasion to examine and construe the act of 1858 in the case of *Kingsland* v. *Mayor, etc.* (110 N. Y. 569), and the expressions there used indicated an opinion that its operation was not confined to vessels engaged in the coasting or river traffic, but included transatlantic steamship lines as well. Such conclusion is in harmony with the apparent scheme of the law and finds some support in the general language of the act. This court, however, seems to have taken a different view in the earlier case of *Commissioners of Pilots* v. *Clark* (33 N. Y. 251), and it is not necessary now to determine which is the correct construction. By the provisions of the act of 1871, now sections 711 and 716 of the Consolidation Act, the city has authority to lease these bulkheads when acquired by it, without limitation as to the kind of vessels making use of them, for a period of ten years and to renew such leases for like periods not exceeding fifty years in the aggregate.

" Whatever the restrictions may have been upon the scope of the act of 1858, its effect was to add largely to the value of the rights of the wharf owner. The proprietors of steamboat lines were always willing to pay for the exclusive or preferential use of a bulkhead a rental greatly in excess of the sum total of that which might be collected from the common use of the wharf by the public. The system of private ownership of wharfage rights was, however, cumbersome, and its workings evidently unsatisfactory. The material prosperity of the city was so dependent upon its commerce that nothing short of the exclusive ownership and control by the body politic of all the docks and other like facilities required for the encouragement of ocean and river traffic would be sufficient to meet the wants of the public in this respect. The legislature recognized this necessity and by the enactment of chapter 574 of the Laws of 1871, inaugurated a radical and sweeping change of policy upon the subject. Private ownership of

wharves and wharfage rights were from that time subjected to a process of extinction.

" The defendants were authorized to establish a new bulkhead and pier line on the Hudson river front. Pursuant to this authority, the dock department, with the approval of the commissioners of the sinking fund, adopted a plan by which the entire bulkhead line, at least in the vicinity of these premises, was changed and extended into the river a distance of 175 feet, and the intervening space was to be filled in with solid filling. The law also authorized the city authorities to purchase, either by agreement with the owners' or by condemnation, all wharf property belonging to private individuals, which might be required for the purpose of carrying this plan into effect. The practical result of this revolution in the system of dock supervision and ownership was to withdraw from the general market all private rights of wharfage which might be found in the pathway of this great public improvement. Thereafter there could be but one probable purchaser of all such rights, and that purchaser the city. Even for speculative purposes, an intending purchaser of such property would fix the price with a view to the sum which the city would pay, or be compelled to pay, when it consummated the appropriation of it, under the act of 1871. Expert witnesses could not speak with any degree of precision or intelligence of its market value in 1877, predicated upon actual sales, because such property must have ceased to be the subject of general bargain and sale for several years previously. It was this difficulty which embarrassed the court when the first report upon the last reference came before it for confirmation. It was evident to the General Term, as it must be from a perusal of the testimony, that the estimates of the so-called expert witnesses were largely theoretical and speculative and not founded upon actual sales made of similar property, and were, therefore, unreliable as a measure of value. But it discovered that the city had recently been making purchases of property of the same kind in the immediate vicinity. Evidence of these purchases had been offered and excluded by the referee, and the court below concluded that such evidence, if received, would have afforded a fair ground upon which to base an estimate of value, and sent the

matter back to the referee in order that this proof might be admitted.

"In the reception of this testimony, we do not think any error was committed of which the defendants can justly complain.

"Under the circumstances, it was the best evidence obtainable, which is all that can reasonably be required in any case. A departure from the ordinary rule which will not allow affirmative evidence to be given of the sales of other real property in the same vicinity for the purpose of establishing the value of the property in controversy, was, therefore, permissible. The considerations which led to the adoption of this rule seem to have been two-fold. It was primarily a rule of convenience to avoid protracted trials by the introduction of collateral issues, and, secondarily, for the protection of litigants who could not be expected to be prepared to try such issues of which they had not previously had notice.

"Neither of these considerations are operative in the present case. The sales proven were confined to purchases made by the defendants, themselves, few in number, and they had due notice by the decision of the General Term that this field of inquiry would be entered upon before the referee. The transactions might also properly be regarded as admissions by the defendants of the value of property of the same general kind as that of the plaintiffs. It cannot be said that the evidence related to property intrinsically dissimilar. The proof is otherwise. At least, if any dissimilarity was shown, it was to the prejudice of the plaintiffs. The witnesses interrogated upon the subject all testify that plaintiffs' property is more valuable, if anything, than other property of its kind along the river front. One witness says : 'It is the choicest dock property in the city of New York, because all the big Atlantic liners center there, and it is most convenient for their business, and it is the most convenient for the choicest kind of trade that comes to New York, and that is the dry goods trade ; it is close to or convenient to the dry goods district.'

"The testimony of other witnesses is equally emphatic upon this point. It is claimed that the six pieces of property referred to were more valuable because of the existence of sheds

and platforms; but it appears that plaintiffs' wharves were equipped with platforms.

"As to both sheds and platforms, it is undisputed that they were constructed under licenses granted by the dock department, revocable at its pleasure, and that they could not be considered as an element of value was expressly decided by this court in the *Kingsland* case.

"It is further objected to this class of evidence that these purchases were not made until 1884, some seven years after the time when plaintiffs' wharfage rights were appropriated. But it is shown that there was no appreciable difference in the value of such property during this period, and the referee has found in both reports that the value of plaintiffs' property in 1877 and at the time of the trial remained unchanged.

"Much stress was laid by counsel upon the fact that the purchases were made under coercion; that is, that the city was compelled to buy or suspend the work of dock improvements, which would subject it to great loss. But it is not seen that the relation of the defendants' enterprise to the property so purchased differs in any material respect from its attitude with reference to the plaintiffs' property. In both cases the city is compelled to buy and the owner compelled to part with his title; but in neither case can it be said that the price was or is a matter of compulsion. The law has wisely guarded the municipality against extortion by providing a method of judicial procedure for the ascertainment of the just and fair value of the property taken, which the defendants can be required to pay and the owner compelled to accept. The immediate necessities of the city could not have been such as to have required it to purchase these wharfage rights at the owner's price. It was in possession of the land to which these incorporeal hereditaments and easements attached, and if it seasonably instituted and prosecuted with diligence the necessary proceedings to acquire title by condemnation, it is not probable that any court in the exercise of a sound discretion would have enjoined the defendants from the continuance of the work during the pendency of the proceedings.

"It is proper to note, in connection with this evidence, that it was, in one sense, merely cumulative. Other evidence of

the same character had been introduced by the plaintiffs and received without objection. The witness Kingsland testified to the purchase of an interest in wharfage property adjoining plaintiffs in 1874 or 1875, at the rate of $1,000 per running foot, and the witness Carrington to sales made to the city in 1884 and 1885 by Dodge, Cockroft and the Old Dominion Steamship Co. at the rate of $550 and $600 per foot.

" The disposition we have made of this question is not in conflict with the decision of this court in the *Matter of Thompson* (127 N. Y. 463). The rule was there correctly laid down 'that the value of property, which depends upon the presence or absence of inherent qualities, not necessarily present or absent in other and similar property, cannot be proved by showing the price paid for such other and similar property.' Here it has been shown that the same inherent qualities of productiveness, both present and prospective and of advantageous location for commercial uses, were present in the other property purchased by the defendants for the same purposes and to complete the same plan of improvement for which the plaintiffs' property is required.

" In the *Thompson* case dissimilarities appeared between the property purchased and the property sought to be taken to such an extent that the learned judge, who delivered the opinion of the court, was constrained to observe that even under the rule in Massachusetts and some other states, which makes the admission of such evidence discretionary, its exclusion by the commissioners was a proper exercise of judicial discretion.

" This case has been pending for fifteen years. It has many special and anomalous features. Upon a simple question of value, which depends for its determination so largely upon the opinion of men, the judgment should not be set aside, except for the most cogent reasons.

" We do not find in the voluminous record any error which we may not disregard under the rule laid down for our guidance in section 1003 of the Code, and the judgments should, therefore, be affirmed, with costs."

*Thomas P. Wicks* and *James Hillhouse* for appellants.

*Wheeler H. Peckham, Richard S. Emmett, Thomas L. Ogden* and *W. J. Marrin,* for respondents.

MAYNARD, J., reads for affirmance.
All concur, except PECKHAM, J., taking no part.
Judgments affirmed.