**BUENA VISTA LAND & DEVELOPMENT CO. v. LUCAS, Internal Revenue Commissioner.**

No. 5890.

Circuit Court of Appeals, Ninth Circuit.

May 26, 1930.

Shirley C. Ward and Chandler P. Ward, both of Los Angeles, Cal., for petitioner.

G. A. Youngquist, Asst. Atty. Gen., and Sewall Key and J. Louis Monarch, Sp. Assts. to Atty. Gen. (C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and James McG. Williamson and Percy S. Crewe, Sp. Attys., Bureau of Internal Revenue, all of Washington, D. C., of counsel), for respondent.

Before DIETRICH and WILBUR, Circuit Judges, and NORCROSS, District Judge.

WILBUR, Circuit Judge.

This is a petition to review an order of the United States Board of Tax Appeals which affirms a decision of the Commissioner of Internal Revenue fixing a tax on corporate income of petitioner for the year 1921 amounting to $76,019.34. On June 28, 1921,

an arrangement was entered into between the Honolulu Consolidated Oil Company, the United States government, and the petitioner, whereby the petitioner surrendered its rights in certain oil land in Naval Reserve No. 2, in Kern county, Cal., to the Honolulu Consolidated Oil Company which had developed the property as oil land, surrendered its rights under certain placer mining claims, and received from the government a lease under which it paid the government certain royalties for the occupation of the land to which it had theretofore claimed a complete equitable title by reason of its discovery, location, and development as oil land, whereupon the Honolulu Consolidated Oil Company transferred to the petitioner a number of the shares of its corporate stock aggregating in market value $375,000. The petitioner before the settlement had transferred part of its interest in the land, and the proportion of the stock owing to it was of value of $174,-259.43, and upon this latter amount the tax was computed. The claim of the petitioner upon the land in question was by virtue of the selection of the land by the state of California as lieu land upon its surrender of certain school lands in national parks and the purchase from the state by the petitioner of such land. The exact details concerning these transactions are disclosed in the opinion of the Board of Tax Appeals and need not be repeated here. Suffice it to say that on the 1st of March, 1913, there only remained to perfect the legal title of the petitioner to the land in question the approval of the Secretary of the Interior, which had been withheld upon the ground that the land was then known to be mineral land. The petitioner then owned exactly what it owned at the time it made the agreement of settlement and received in consideration therefor the sum upon which the Commissioner of Internal Revenue has levied the tax. The only change in the situation has been the fluctuations in value due to the various legal steps involved in the effort of the government to set aside the placer mining locations on the land made by the assignors of the Honolulu Consolidated Oil Company, and thus secure complete title to said land as a part of said Naval Reserve and the efforts of the Honolulu Consolidated Oil Company to maintain its possession as against the petitioner and to enforce as against the government its rights to the fee-simple title to said land by virtue of the discovery and development of oil therein. The various steps taken by the parties and by the court are set out in the opinion of the Board of Tax Appeals and need not be repeated here. The tax was levied under sections 213 and 202 of the Revenue Act of 1921, chapter 126, 42 Stat. 227. The amount received by the petitioner to be taxed is a gain or profit and income derived from any source whatever. Section 213. The transaction of settlement under which the petitioner released its rights in the government land to the government was treated by the Commissioner of Internal Revenue and by the Board of Tax Appeals as a sale of real estate, and in determining the gain or profit derived therefrom the Commissioner allowed no deductions therefrom. It is conceded that section 202, subdivision (b)(1), applies to the situation. This subdivision provides:

"If its fair market price or value as of March 1, 1913, is in excess of such basis [i. e., the cost], the gain to be included in the gross income shall be the excess of the amount realized therefor over such fair market price or value."

It was proved that the land involved in the transaction was worth about $25,000,000 on March 1, 1913, and was worth as much or more at the time of the settlement. The question with which the Board of Tax Appeals concerned itself was the relative market value of the property at the time of its sale, or surrender, and its value on March 1, 1913. The Board announced that it would fix the tax upon the difference between the two.

It was thus the duty of the Board of Tax Appeals to ascertain the value of the property disposed of June 28, 1921, as of the date of March 1, 1913 (section 907(b), 44 Stat., chap. 27, pp. 9, 107), and fix the same in its findings. This the Board failed to do and for this error its decision must be reversed. Kendrick Coal & Dock Co. v. Commissioner of Internal Rev. (C. C. A.) 29 F. (2d) 559; Pfleghar Hdw. Specialty Co. v. Blair (C. C. A. 2) 30 F.(2d) 614; Chicago Ry. Equip. Co. v. Blair (C. C. A. 7) 20 F. (2d) 10. In view of the necessity for a new hearing and the difficulty encountered by the Board of Tax Appeals on the previous hearing in ascertaining the value of the appellant's interest in the land on March 1, 1913, it should be said that while offers to purchase land are not usually admissible as evidence of the value of that or other land in the neighborhood (Sharp v. United States, 191 U. S. 341, 350, 24 S. Ct. 114, 48 L. Ed. 211; see, also, cases cited in note 5 Ann. Cas. 971), this is a rule of policy, based in part upon the unwisdom of the introduction of collateral matters into the primary inquiry. A similar rule requires the rejection of evidence

of sales of land in the vicinity, although in a majority of the states such evidence of actual sales is admitted. Ann. Cas. 1916E, 598, note. The New York courts have excluded such evidence of actual sales (Id.), yet they have relaxed the rule in a case where such evidence under the peculiar circumstances of the case is the best evidence obtainable (Langdon v. Mayor, etc., of City of New York, 133 N. Y. 628, 31 N. E. 98, 101). The court was there speaking of the value of the certain waterfront or wharfage rights belonging to the plaintiff and appropriated by the city of New York. Its reasons for the relaxation of the general rule are thus stated:

"The law also authorized the city authorities to purchase, either by agreement with the owners or by condemnation, all wharf property belonging to private individuals, which might be required for the purpose of carrying this plan into effect. The practical result of this revolution in the system of dock supervision and ownership was to withdraw from the general market all private rights of wharfage which might be found in the pathway of this great public improvement. Thereafter there could be but one probable purchaser of all such rights, and that purchaser the city. Even for speculative purposes, an intending purchaser of such property would fix the price with a view to the sum which the city would pay, or be compelled to pay, when it consummated the appropriation of it, under the act of 1871. Expert witnesses could not speak with any degree of precision or intelligence of its market value in 1877, predicated upon actual sales, because such property must have ceased to be the subject of general bargain and sale for several years previously. It was this difficulty which embarrassed the court when the first report upon the last reference came before it for confirmation. It was evident to the general term, as it must be from a perusal of the testimony, that the estimates of the so-called 'expert witnesses' were largely theoretical and speculative, and not founded upon actual sales made of similar property, and were therefore unreliable as a measure of value. But it discovered that the city had recently been making purchases of property of the same kind in the immediate vicinity. Evidence of these purchases had been offered and excluded by the referee, and the court below concluded that such evidence, if received, would have afforded a fair ground upon which to base an estimate of value, and sent the matter back to the referee in order that this proof might be admitted. In the reception of this testimony we do not think any error was committed of which the defendants can justly complain. Under the circumstances, it was the best evidence obtainable, which is all that can reasonably be required in any case. A departure from the ordinary rule, which will not allow affirmative evidence to be given of the sales of other real property in the same vicinity for the purpose of establishing the value of the property in controversy, was therefore permissible. The considerations which led to the adoption of this rule seem to have been twofold. It was primarily a rule of convenience to avoid protracted trials by the introduction of collateral issues, and, secondarily, for the protection of litigants who could not be expected to be prepared to try such issues, of which they had not previously had notice. Neither of these considerations are operative in the present case. The sales proven were confined to purchases made by the defendants themselves, few in number, and they had due notice by the decision of the general term that this field of inquiry would be entered upon before the referee."

Likewise in the case at bar it is evident that an estimate of the market value of a right in litigation which if fully established is worth $25,000,000, and if wholly rejected is a liability, is largely speculative, and must be based in large measure upon the reasonable probabilities of the outcome of the litigation. If appellant's right has no market value, its value March 1, 1913, must nevertheless be fixed by the Board of Tax Appeals by the best evidence obtainable. The appellant was paid $350,000 by way of compromise in 1921 by the Honolulu Consolidated Oil Company, and this was accepted as the selling price of the appellant's right at the time of sale. It had the same right in 1913, and an offer by the same party to settle the same litigation for the sum of $450,000, if made in good faith, would be the best evidence obtainable that the right was worth at least that amount at that time.

Assuming that the land was worth the same in 1913 that it was in 1921, and that the appellant's interest was exactly the same in 1913 as in 1921, as seems to be the case, it is obvious that the value of appellant's interest was exactly the same in 1913 as in 1921, unless we speculate as to the relative probabilities of recovery in 1913 and in 1921. The Board of Tax Appeals declared in its opinion that it would not indulge in such speculation, and yet seemed inclined to hold that unless the appellant produced some affirmative evidence of market value in 1913

134

other than the testimony of one of its officers as to its market value, it would for lack of such evidence hold that it was of no value at that time. This, we think, was an erroneous view. When the taxpayer established the fact that its rights were the same on both dates and the value of the land the same, it has made a prima facie showing that there was no increase in value, and hence no taxable income. If the court and departmental decisions between these dates altered this prima facie showing, the Board should determine to what extent the value of the interest was thereby altered. Certainly it cannot be said that it had no value in 1913, neither can it be said that the appellant failed to show any value of its interest in the property on that date, and therefore failed to show error in fixing the tax.

Reversed.