## BELRIDGE OIL CO. v. COMMISSIONER OF INTERNAL REVENUE.

### No. 8114.

Circuit Court of Appeals, Ninth Circuit.
Sept. 21, 1936.

Claude I. Parker, John B. Milliken, and Bayley Kohlmeier, all of Los Angeles, Cal. (Llewellyn A. Luce, of Washington, D. C., of counsel), for petitioner.

Robert H. Jackson, Asst. Atty. Gen., and Sewall Key and Robert N. Anderson, Sp. Assts. to Atty. Gen., for respondent.

Before WILBUR, GARRECHT, and DENMAN, Circuit Judges.

GARRECHT, Circuit Judge.

A petition to review a decision of the Board of Tax Appeals in this proceeding was heretofore heard by this court and at that time a per curiam opinion was rendered. See 69 F.(2d) 432, 433. The Board of Tax Appeals was directed to find specifically the actual value of the option involved at the time it was transferred to petitioner. In that connection, among other things, the court said:

"If the sum of $160,000 and one-fourth of his stock in the company was paid by Hole to secure an option which was more favorable in its terms than the one he then held, and if this option so secured by him was turned over to the corporation, the fact that it cost Hole $160,000 was an element to be considered by the Board in arriving at its conclusion as to the cost and as to fair cash value of the option.

"All that we have said in this matter is for the purpose of emphasizing the fact that there is no direct finding by the Board of Tax Appeals on the ultimate fact involved in the determination of this appeal, and, consequently, that the case must be returned to them for such a finding. We do not wish to be understood as determining whether or not such payment of $160,000 was made nor the circumstances or agreements under which it was made. That question is for the Board. We leave to the Board the question of whether or not it will re-examine the witnesses with reference to this payment of $160,000 and the stock, whether they will proceed to hear new or additional evidence upon the question of value, or will determine the value on the evidence already adduced before them."

The Board of Tax Appeals declined to hear further testimony, but based upon the evidence previously submitted it definitely found: "The actual cash value of the option on January 25, 1911, was $25,000."

This review involves income and excess profits tax for the year 1921 in the amount of $45,293.85, proposed against the petitioner.

Petitioner is a California corporation. On January 25, 1911, it acquired in payment of its capital stock a certain option to purchase the lands hereinafter mentioned. The sole question involved is the actual value of this option at the time it was acquired by petitioner. If the value of the option is satisfactorily substantiated, there is no question about its inclusion in invested capital.

In 1910 and prior thereto, one Emily B. Hopkins, now deceased, owned 30,845.96 acres of land in one parcel, situated in Kern county, Cal., lying between certain oil fields

known as the McKittrick field and Lost Hills field. Mrs. Hopkins lived in New York. She also had other land interests in California, all of which were managed by agents in that state.

W. J. Hole, an experienced real estate dealer in California, and who had been resident agent of a land company in which Mrs. Hopkins owned a majority interest, by reason of his former association with Mrs. Hopkins and her agents, was able in 1910 to secure an option from her for the purchase of this tract of land for $20 per acre. Hole desired this option because he knew the land was valuable for agricultural purposes, and since it was located between oil-producing properties he hoped it might prove valuable as oil property. He was not, however, an experienced oil man.

In that year, William Van Slyke visited this Hopkins tract and there noticed outcroppings similar to those upon proved oil lands. He dug a fourteen-foot hole or shaft and discovered soil which he tested and proved to be live oil sands. After concealing the hole with planks and brush, he informed Max Whittier, now deceased, of his discovery. Whittier visited the property with Van Slyke and advised him not to disclose the information to any one and that he would attempt to acquire some of the land.

About this time Hole informed Whittier, whom he knew to be an experienced oil man, that he had an option to purchase the Hopkins property and offered to sell the property to him for $33⅓ per acre and a one-fifth interest in any company organized to take it over. Hole did not tell Whittier of the terms of his option and Whittier did not tell Hole of Van Slyke's discoveries upon the property. Whittier and Hole had a conference in the presence of Burton E. Green, an associate of Whittier, and also an experienced and successful oil man, who had been informed of Van Slyke's discovery and who was familiar with that general territory. Whittier and Green at that time agreed to take the option if it could be changed so as to permit them, before exercising it, to drill for oil.

To secure the new option Hole found it necessary to enlist the services of a cousin of Mrs. Hopkins, and also those of her agent, William Hill. He was forced to pay to the cousin $125,000, and to Hill $35,000 and one-fourth of Hole's stock in petitioner, for their services in securing the option. The option as desired was secured January 5, 1911, and provided very favorable terms for the drilling of test wells before exercising the option for the purchase of the property by Hole for $33⅓ per acre.

Besides these amounts paid to her agent and her cousin there was an additional sum of $25,000 paid directly to Mrs. Hopkins before Hole acquired the option.

Later, on January 25, 1911, Hole assigned the option to petitioner in exchange for all but five of the one million shares of stock of petitioner. The five shares at that time were held by dummy incorporators but were subsequently divided between the five parties hereafter named. One-fifth of this stock was retained by Hole, and the balance was immediately transferred to Whittier, Green, M. J. Connell, and Frank Buck; the latter two having been taken into the deal.

Shortly thereafter, two wells were drilled on the premises, one at or near the place where Van Slyke had previously discovered the oil sands that he had proved, the production from each being one hundred barrels of oil per day. Soon thereafter, petitioner gave an option for the purchase of the property at $12,000,000.

Petitioner contends that the option on the Hopkins property, on the date it was acquired, had an actual cash value of $1,671,801.33 and seeks to include that value in its invested capital for 1921. On the other hand, respondent insists that the option, when transferred to petitioner, had an actual cash value of only $25,000, the amount paid Mrs. Hopkins.

The Board of Tax Appeals in its findings and as emphasized in its opinion rejected the evidence of the expert witnesses in toto, and disregarded all the other evidence of the cost and value of the option except this amount received by Mrs. Hopkins. It therefore sustained respondent in excluding from petitioner's invested capital any portion, in excess of $25,000, of the par value of the capital stock issued in 1911 for the option here involved.

The only issue, therefore, is the fair market value of the option transferred to petitioner by Hole at the date of such transaction. To decide this question it is necessary to determine the actual cash value, on January 25, 1911, of the property covered by the option in the light of all the surrounding circumstances. The Board has held that the actual cash value of an option is the difference between the value of the land and the price at which it can be ob-

tained under the option. Karl von Platen, 10 B.T.A. 250; Realty Sales Co., 10 B.T.A. 1217. This method, which we believe to be sound, was apparently ignored by the Board.

The statute under consideration * defines "invested capital" to include the "actual cash value of tangible property other than cash, bona fide paid in for stock or shares, at the time of such payment."

The facts are not in dispute. Hole first secured an option on the Hopkins land whereby he was to pay $20 per acre therefor. Later he negotiated a deal with Green and Whittier by which he was to receive $33⅓ an acre provided he could secure certain changes in the original option. Mrs. Hopkins was informed of the fact that Hole, if his negotiations were successful, would make the difference between $20 in the option to him and $33⅓ per acre, the price named in the changed option of January 5, 1911. He had some difficulty in getting Mrs. Hopkins to agree to the terms demanded by Green and Whittier, and he found it necessary to secure the services of Harry Benedict, her cousin. The negotiations were carried on through Mrs. Hopkins' attorney, who advised Hole that whatever dealings he had with Benedict would be satisfactory. For this new option to him, dated January 5, 1911, Hole was compelled to pay $185,000 in cash and, further, to agree to pay William Hill, agent for Mrs. Hopkins in California, one-fourth of his stock in the Belridge Oil Company. It must be kept in mind that these transactions took place before Hole learned that outcroppings of oil had been discovered on the lands.

Later, on January 25, 1911, when the discoveries of oil sands were known to the parties, Hole then paid for all of the capital stock of the petitioner by transferring this option to it. It is conceded that petitioner is entitled to have the value of its capital stock fixed at the fair cash value of the option, and the question before this court is whether there is substantial evidence to support the finding of the Board

of Tax Appeals that the value of the option was but $25,000 on the date of this transfer.

In this case there was a dissenting opinion written by that member of the Board before whom all the evidence was taken. This dissenting opinion points out that the fixing of the value of the option at the date it was acquired by petitioner at $25,000 was arbitrary and contrary to all the evidence. He states:

"I do not agree with the majority opinion in holding that the option for the sale of the Hopkins land (sometimes referred to as the Belridge property in the record) in fee simple, under the favorable conditions to the purchaser giving him at least one year in which to exercise the option at so favorable a price as $33⅓ per acre, had an actual cash value of only $25,000 at the time such option was paid in to petitioner for stock.

"Since I presided at the hearing in this proceeding and had an opportunity to see the witnesses upon the witness stand, all of whom were called by the petitioner, and observe the candor, earnestness, sincerity and intelligence with which they testified, I felt that I would be derelict in my duty if I did not make known my views fully.

"The valuation of $25,000 placed upon the option in the majority opinion is based primarily upon the fact that such option, which was entered into on January 5, 1911, provides for the payment by Hole of $25,-000 and that this was the amount furnished by Green and paid by Hole for it."

Concerning the conclusion that the $25,-000 received by Mrs. Hopkins individually represented the full value of the option, and answering the argument of the majority opinion that this conclusion must be arrived at because it must be presumed that Mrs. Hopkins' interests were fully protected, the dissenting opinion has this to say:

"Any such presumption that might be indulged in in the ordinary case cannot apply here in the face of the evidence, which shows that Hole paid one Benedict, a neph-

---

* Revenue Act of 1921, c. 136, 42 Stat. 227, 274:

"Sec. 326. (a) That as used in this title the term 'invested capital' for any year means (except as provided in subdivisions (b) and (c) of this section):

"(1) Actual cash bona fide paid in for stock or shares;

"(2) Actual cash value of tangible property, other than cash, bona fide paid in for stock or shares, at the time of such payment, but in no case to exceed the par value of the original stock or shares specifically issued therefor, unless the actual cash value of such tangible property at the time paid in is shown to the satisfaction of the Commissioner to have been clearly and substantially in excess of such par value, in which case such excess shall be treated as paid-in surplus."

ew of Mrs. Hopkins, $125,000 for his services and influence in negotiating this option; that Hole also enlisted similar services and influence of William Hill, Mrs. Hopkins' manager, for which he paid Hill $35,000 and agreed to give him one-fourth of the stock which he (Hole) was to receive in the corporation to be organized; and that Mrs. Hopkins' attorney was 'anxious' for Mrs. Hopkins' nephew to 'make something'. The option was not signed by Mrs. Hopkins, but was signed on her behalf by her counsel, as attorney in fact. This option called for a price for the land of $33⅓ per acre, whereas the first option which Mrs. Hopkins granted to Hole called for a price of $20 per acre for the land. It was understood by Mrs. Hopkins' attorney that the difference of $13⅓ per acre to be paid under such option should go to Hole, and that Mrs. Hopkins would only get $20 per acre for the land if the option were exercised."

There was other uncontradicted testimony as to values.

Two witnesses testified that about the time petitioner acquired this option and before development of the property had been started, one of petitioner's shareholders made a definite offer to purchase one-fifth of the stock of the corporation and pay $500,000 therefor.

The secretary of the Associated Oil Company testified that his company in September, 1910, negotiated the purchase of 24,000 acres of prospective oil land of similar type, location, contour, and topography to the Hopkins land, and that the Associated Oil Company paid $66⅔ per acre therefor.

In addition to this positive evidence of definite facts, bearing directly upon the value of the option, there was uncontradicted testimony of a number of qualified experts of high standing.

Burton E. Green was one of the three organizers of the Associated Oil Company and one of the directors on the executive committee, which initiated and approved sales. He was also instrumental in organizing the Amalgamated Oil Company, and at one time had been its president. Both the Associated and the Amalgamated operated on a very large scale in the state of California. Green was familiar with the Lost Hills and McKittrick oil fields, having an interest in a company that owned a number of thousand acres in the latter, and he was familiar with the land owned by Mrs.

Hopkins lying between the McKittrick and Lost Hills fields, for which this option was given. He had been on the property and had seen the oil croppings, and had helped form the company that paid the price named in the option.

Green testified that he was prepared to go as high as $100 an acre to get the land; that this was its fair market value; which the property would have brought in actual cash on January 25, 1911. He further stated that he considered the difference between $33⅓ and $100 per acre an extreme bargain and that he thought it was the most favorable option he had ever seen. The weight of this testimony is augmented by keeping in mind the fact that this witness was the one principally concerned in accepting the proposition of Hole to sell his option at $33⅓ per acre, together with the further fact that this offer was accepted by the witness as soon as made.

Another expert consulting petroleum geologist, Harry R. Johnson, had been associated with the United States Geological Survey for several years, particularly in the preparation of information concerning oil fields of California, including the McKittrick and Temblar Range region, which lie within six miles of the Hopkins property. Johnson testified that part of his business was to advise prospective purchasers as to values of prospective oil lands, and that having heard the testimony relating to the discoveries of oil indication made on the Hopkins land and having visited the property and corroborated this testimony by actual personal examination, he estimated that the fair market value of this property as of January 25, 1911, was fairly close to $3,000,000—two million nine hundred and some odd thousand.

Another expert, W. W. Orcutt, an employee of the Union Oil Company since 1897, who first organized the geological department of the company, later being chief engineer and manager of the geological and land department, and still later its vice president, and who was familiar during the years 1910 and 1911 with the Midway oil field, Lost Hills section, McKittrick field, and with the general fields in and around the Hopkins property, testified that accepting the definite verification of the explorations made by Van Slyke at the time in question, the fair market value of the property on January 25, 1911, was $2,700,000. He further testified that he was not interested in any way in the outcome of the

hearing, but in fact was the chief geologist and vice president of the Union Oil Company, a competitor of the petitioner herein.

Let us consider the evidence from a different angle. The record clearly establishes that besides the $25,000 paid Mrs. Hopkins, this option cost Hole an additional $160,000 paid to her cousin and to her agent. Besides he was compelled to give one-fourth of his one-fifth share of the capital stock of petitioner, which amounted to 50,000 shares, Hole having been apportioned 200,000 shares for his interest in the option. The remaining four of the purchasing group each received a like number, or a total to them of 800,000 shares. Some definite idea of the value of the million shares of the capital stock of petitioner and the value of the 200,000 shares which were paid to procure the option, may be arrived at by considering what the interested parties invested. Apart from any money expended for development, the amount of cash actually put into the corporation by the four investors other than Hole at the time the option was exercised is not difficult to estimate. If we assume that these parties furnished the money to reimburse Hole for the $185,000 he expended, and $1,003,198.67, the purchase price of the property exclusive of the $25,000 already received by Mrs. Hopkins, the total amounts to $1,188,198.67. At this figure the 800,000 shares apportioned to this group of four cost them for each share approximately $1.4852. On this basis the stock paid to Hole had a value of $297,040 and by adding the $185,000 paid out to the others, would amount to $482,040, the value given in exchange for the option, other factors not considered.

As a further indication of the value of the option, it appears from the record that when the petitioner decided to exercise its option and purchase the land the result was a clear profit to Hole of $411,279.46, the difference between $20 and $33⅓ per acre, less the $160,000 he expended for the option, or $251,279.46, not considering the stock of the corporation which he received in addition thereto. The value of this stock which he retained, as heretofore computed, was $222,750, making a total in value of $474,029.

The four men who furnished this financial backing were all experienced and successful oil men and by putting their money into the corporation convincingly demonstrated their belief that the option was of great value.

The figures heretofore used are based on the factual evidence of money actually invested, but if we take the evidence produced upon the hearings as to the value of the land, as compared with the actual cash expended to secure the option in order to arrive at the value of the option, the results obtained are much more favorable to petitioner. The lowest figure given by any expert witness puts the value of the land at $2,700,000 on the date the petitioner secured this option; therefore, the value of the option as of that date would be the difference between that figure and the purchase price, $1,028,198.67, or the sum of $1,671,801.33, the figure contended for by petitioner. It must be borne in mind that the values given by the expert witnesses were not met or rebutted by any proof to the contrary but stand undisputed in the record. In fact, this testimony as shown is corroborated by other competent, credible and persuasive evidence, much of which is inherent in the situation.

The Board not only disregarded the opinion testimony of the experts, but it ignored factual evidence as well. No evidence whatever was offered for respondent, and the findings are against all the positive and affirmative evidence and are not supported by the record.

The proof of value as pointed out does not depend upon the testimony of experts alone, but even if it had, for that reason, it should not have been slighted as utterly unworthy of notice. These experts were men of wide experience, and well acquainted with the conditions existing in and about the premises, which had any bearing upon the value of the option at the date it was acquired by the petitioner. Their testimony was not controverted and their opinion should be given weight and consideration.

The opinion of the majority of the Board admits that it disregarded practically all of petitioner's evidence, and based its decision entirely upon the incident that Mrs. Hopkins received $25,000 as her share of what was paid by Hole to secure the option, disregarding and ignoring the further fact that by her direction, or at least upon the suggestion of her attorney, Hole was required to expend the further additional sum of $160,000 before he could acquire the option.

The evidence shows that at the time when this option was so procured by Hole he did not know, and there is no evidence in the record to show that Mrs. Hopkins or any of her agents knew, that outcroppings of oil had been discovered on the lands at the time the negotiations were concluded with Hole; while, on the other hand, from the evidence it affirmatively appears that at the time the option was acquired by the petitioner herein, through its officers and agents, it had knowledge of these oil showings. The majority opinion of the Board meets this situation with the observation that Mrs. Hopkins may reasonably have suspected that Hole had such information.

This assumption of a suspicion of a nonexisting fact not found in the evidence is thus made the sole basis of the finding by the Board that the value at the date of the acquisition of the option by this petitioner was but $25,000.

It is contended that the Board is not required to follow the testimony of experts, but may disregard their evidence entirely. This statement is too broad to be correct. In Boggs & Buhl v. Commissioner (C.C.A.3), 34 F.(2d) 859, at page 861, the court said: "While the board may, as a general principle, reject expert testimony and reach a conclusion in accordance with its own knowledge, experience, and judgment, yet it must have knowledge of and experience with the particular subject under consideration. There is no evidence that the board had any independent and personal knowledge whatever of the business, reputation, and good will of the petitioner. Therefore it could not set aside or disregard all the positive and affirmative evidence as to the value of the good will, and base its conclusion upon conjecture."

To the same effect are Pittsburgh Hotels Co. v. Commissioner (C.C.A.) 43 F.(2d) 345; Nichols v. Commissioner (C.C.A.) 44 F.(2d) 157; Bonwit Teller & Co. v. Commissioner (C.C.A.) 53 F.(2d) 381, 82 A.L. R. 325.

The case of Uncasville Mfg. Co. v. Commissioner (C.C.A.) 55 F.(2d) 893, cited for respondent, does not contravene this doctrine.

While the Board may reject expert testimony and reach a different conclusion, to justify it in so doing, as pointed out by the authorities, it must itself have knowledge of the subject-matter and experience with it. There is no evidence whatever in this record to indicate that the Board has any independent knowledge of the particular facts in this case. Indeed, the Board specifically disclaimed this essential when it said in its opinion "nor have we substituted our own 'knowledge, experience and judgment' for the opinions of these experts." Since no evidence whatever was submitted for respondent, it was error wholly to ignore this testimony.

The presumption of correctness of the determination of the Commissioner was thus overcome by positive and affirmative testimony for the petitioner, which stands unimpeached. The Board's finding of value is therefore contrary to all the testimony.

The only conclusion that can be drawn from the evidence submitted to the Board is that, on January 25, 1911, the date the option was acquired by petitioner in exchange for its capital stock, the option had an actual cash value far in excess of the amount fixed by the Board; and that there being no evidence to sustain its finding, the decision of the Board cannot be sustained. What the value of the option was when acquired by petitioner is primarily the duty of the Board of Tax Appeals to determine. Citrus Soap Company of California v. Lucas (C.C.A.9) 42 F.(2d) 372; Buena Vista Land & Development Co. v. Lucas (C.C.A.9) 41 F.(2d) 131.

We are aware that it is not within the province of this court to make findings of fact. In determining, however, that Hole had paid $125,000 to Benedict and $35,000 and one-fourth of Hole's stock in the Company to Hill, the Board itself has made a finding of fact. Contrary to the instructions contained in our first opinion—namely, that such payments were "an element to be considered by the Board in arriving at its conclusion as to the cost and as to the fair cash value of the option"—the Board has ignored this "element" and has persisted in its original implied finding that "the actual cash value of the option on January 25, 1911, was $25,000," the amount paid directly to Mrs. Hopkins. In view of our previous instructions to the Board, which instructions constitute the law of the case, the two foregoing findings of the Board in its latest memorandum are repugnant and therefore constitute an error of law. This error alone would compel us to reverse the case.

Where it appears, as in this record it does appear, that the methods pursued were

erroneous, the presumption that the determination of the Commissioner was prima facie correct no longer avails.

The evidence before the Board of Tax Appeals shows that the petitioner's option was worth at least the $185,000 which was expended to secure it, plus the value of the option which Hole surrendered, less the $13⅓ per acre which he was to receive from the Belridge Oil Company. This value should be determined from a proper consideration of all the evidence as herein indicated.

The order of the Board is reversed, with instructions to proceed in accordance with the views herein expressed.

The presumption that the determination of the Commissioner was prima facie correct no longer avails, where it appears, as in this record it does appear, that the evidence overcomes such presumption. The evidence before the Board of Tax Appeals shows that the petitioner's option was worth at least the $185,000 which was expended to secure it, plus the value of the option which Hole surrendered, less the $13⅓ per acre which he was to receive from the Belridge Oil Company. This value should be determined from a proper consideration of all the evidence as herein indicated.

The order of the Board is reversed, with instructions to proceed in accordance with the views herein expressed.