### MANUFACTURERS PAPER CO. v. COMMISSIONER OF INTERNAL REVENUE.

No. 212.

Circuit Court of Appeals, Second Circuit.

April 5, 1937.

John G. Turnbull, of New York City, for petitioner.

Robert H. Jackson, Asst. Atty. Gen., and Sewall Key and Morton K. Rothschild, Sp. Assts. to Atty. Gen., for respondent.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

SWAN, Circuit Judge.

In 1924 the taxpayer sold stock of Shawmut Manufacturing Company, 1,900 shares of which were acquired prior to March 1, 1913. The Board found the value of these shares on that date to have been $256,309. This was very much less than the value asserted by the taxpayer, and resulted in a largely increased profit and a tax deficiency of $65,903.12. Upon this appeal the only question is whether there is substantial evidence to support the Board's valuation.

The Shawmut Manufacturing Company (for brevity hereafter called Shawmut) was a Maine corporation organized in 1904 with a capital stock of 2,000 shares of a par value of $100 each. In 1905 the taxpayer, a New York corporation, acquired 1,900 shares of Shawmut at a cost of $190,000. In May, 1913, Shawmut increased its capital stock to $500,000, and offered the additional 3,000 shares to its stockholders at par. The taxpayer purchased 2,750 shares at $275,000. In August, 1924, the outstanding 5,000 shares of Shawmut stock were sold to Central Maine Power Company at a price which gave the taxpayer $1,119,500.62 for its 4,650 shares. In its return for 1924 it reported a profit of some $61,000, which the Commissioner surcharged by nearly $600,000. The taxpayer appealed to the Board. Before the Board it was agreed that $275,000 was the proper basis for the 2,750 shares acquired in May, 1913, so that the sole issue remaining for decision was the fair market value of the 1,900 shares owned by the taxpayer on March 1, 1913.

The stock was not listed on any stock exchange. Shawmut's operations had not been profitable, and in 1912 it decided to discontinue its wood pulp and lumber business and to engage in generating hydroelectric power. By March 1, 1913, it had erected a dam of reinforced concrete construction, 1,100 feet long and 20 feet high, which could be raised four feet more by flashboards, had built a power house large enough to accommodate six power units, of which three had been installed, each capable of developing 1,200 horse power, and had contracted for the sale of 2,000 horse power per year at $55,000, which was less than a fair price. More than $566,000 was spent on the dam, power house, and flowage rights prior to March 1, 1913, and some $505,000 of this sum was obtained by loans from the taxpayer. On the critical date Shawmut also owned timberlands, a pulp mill, and appurtenances which were carried on its books at about $472,000. The water power interests and timberland interests of Shawmut were segregated in the early months of 1913 by the formation of a company to which the timberlands were transferred in exchange for $450,000 of its stock. The date is not entirely clear, but as these assets appeared on the March 1st balance sheet and did not appear on the balance sheet of May 1st, it must have occurred between these dates. Shawmut distributed $200,000 of these shares to its stockholders as a dividend, and sold the remaining shares at par, $250,000, to the taxpayer, apparently taking in payment credit upon its debts to the latter. "In the late spring of 1913" Shawmut received an offer from Central Maine Power Company for the purchase of all its shares at a cash price of $1,300,000, free of corporate

debts. This offer was repeated in 1916, 1918, and 1919 and was made by the corporation that ultimately purchased the stock in 1924 for $1,578,000, free of debts. The 1913 offer was supported by the testimony of a banker who was prepared to supply the purchaser with the funds if the offer were accepted. Both the offeror and the banker were well qualified to know the value of the property. It will be observed that this offer was subsequent to the segregation of the timber lands. There was also much other testimony as to the value of the water-power rights and hydro-electric plant, expert witnesses appearing for each side. Their estimates ranged from $2,695,000 to $800,000.

After discussing the evidence at length and showing that the expert testimony was not reliable, the Board referred to the Central Maine's offer as "entitled to some weight" but did not in terms accept it as the basis of their conclusion that the 1900 shares of Shawmut stock had a value of $256,309 on March 1, 1913. However, it seems apparent that it was used as the basis of their computation, for if the liabilities shown on the March 1st balance sheet, namely, $1,030,201.10 exclusive of capital stock, be subtracted from $1,300,000, the value of the 2,000 shares of capital stock is shown to be $269,798.90, and the value of 1,900 shares on this basis is $256,308.96. The correspondence between this figure and the valuation adopted by the Board is so nearly exact that the inference is irresistible that their valuation was arrived at in this way. No other combination of figures appearing in the record could produce it.

[1-3] Since value is the price that would result from fair negotiations between a willing seller and a willing buyer (Brooks-Scanlon Corporation v. United States, 265 U.S. 106, 124, 44 S.Ct. 471, 475, 68 L.Ed. 934), the use of the $1,300,000 offer to fix the minimum value of the hydro-electric assets would seem to be entirely proper; indeed, in the circumstances it appears to have been much the best evidence of such value. Buena Vista Land & Development Co. v. Lucas, 41 F.(2d) 131, 133 (C.C.A.9). The bona fides of the offer, the financial responsibility of the offeror, and his qualifications to know the value of the property were proved without dispute by his own testimony and that of a banker ready to supply the money. Hence the criticisms leveled against the evidence of offers in general, as in Sharp v. United States, 191 U.S. 341, 349, 24 S.Ct. 114, 48 L.Ed. 211, were satisfactorily met. The difficulty in the Board's use of the offer lies in their deducting all the corporate liabilities from a valuation attributable to only part of the corporate assets. The offer presupposed that the stock represented only the hydro-electric assets, for the timberland assets had already been transferred to another corporation, but the March 1st balance sheet carried them on the credit side. These so-called timberland assets, which include some nine asset items in addition to the timberlands, totaled $472,236.96. They do not appear on the May 1st balance sheet, and the Board's opinion stated that "the record contains no evidence relating to the closing of the accounts." In this the Board appears to have been in error, at least as to the timberlands carried at $383,000, and to have overlooked Respondent's Exhibit B (page 186) which explains the segregation of the timberland interests from the water-power interests by transfer to a newly organized Timberland Company in exchange for $450,000 of its stock, of which five-ninths was sold to the taxpayer at par. The ultimate fact to be found by the Board was the fair market value of the 1900 shares of Shawmut stock on March 1, 1913, and that depended upon the value of the assets and the amount of the liabilities. Since the computation by which the Board fixed their valuation of the stock ignored the value of the timberland assets and deducted all liabilities from the value ascribed to the hydro-electric assets, their valuation cannot be supported. The March 1st value of the timberland assets should either have been added to the amount of the offer or deducted from the total liabilities subtracted from the amount of the offer. No finding was made as to the value of the timberland assets. To correct this omission in the findings, the cause should be remanded.

The order is reversed and the cause remanded for further proceeding in conformity with this opinion.