Booth, Chief Justice,
delivered the opinion:
The determination of this case involves principally an issue of fact. The plaintiff, a Delaware corporation and a *24 subsidiary of the Bethlehem Steel Company, had in course of construction four single screw steamships named, respectively, the Feltore, Otcbore, Santore, and Firmore. Each of the steamships was of especial design and provided with unusually large hatches and stowage space, having been so designed with reference to expeditious and economical transportation of ore from Cuba to Atlantic ports for the use of the Bethlehem Steel Company. The ships each had a tonnage capacity in excess of 2,500 tons, aiid for this and other reasons fell within the Government’s requisition order of August 3, 1917. This order, which we need not reproduce, requisitioned title to all hulls of the enumerated capacity, then building in American shipyards. The authority for the requisition order of the Government, as well as its effect, is not challenged. Soon after the proclamation of the order the Bethlehem Steel Company, through its authorized officials, sought to release from its operation the hulls of the four steamships herein involved. Representations were made to the Shipping Board, to whom the President had delegated authority to requisition ships and ships in course of construction, that the loss of the plaintiff’s four ships would seriously impair the Steel Company’s ability to produce essential war material and otherwise cripple and impede its programme of operations. The Shipping Board recognized the force and merit of the plaintiff’s contentions, and in according weight thereto agreed to release title to the hulls to the plaintiff, reserving to the board the right to requisition the ships when they were completed, the parties fully understanding that the plaintiff should have the right, free of cost to the Government, to operate the ships, as operating agent for the board, in the trade of the Steel Company until such a time as the emergencies of war required their use in the service of the Government. In pursuance of this agreement the use of the ships was duly requisitioned, when completed, under a requisition order dated October 12, 1917, and the plaintiff executed requisition charters therefor by the express terms of which the plaintiff bound itself to accept for their use by the Government the rate of compensation fixed from time to time by the board. The ships remained in the possession of and were used by the plaintiff under the *25 requisition charters until April 28, 1918. On this date the board took over the use of the Feltore, and thereafter, on June 10, 1918, the Gubore was taken; the Santore on August 30, 1918; and the Firmore on September 17, 1918.
As to the facts recited and as to the length of time the ships were retained in Government service, as well as the compensation due the plaintiff for their use, there is no disagreement between the parties. The issue herein is confined to the terms of an oral agreement contemporaneous with the taking of the ships from plaintiff’s possession for Government use. During the war an urgent request from military sources in France reached the Shipping Board to provide ships of sufficient cargo and stowage capacity for the transportation of set-up locomotives manufactured in this country for military use abroad. The prior and prevailing method of shipment of locomotives, because of the cargo capacity and stowage space of available ships, necessitated their transportation in “ knocked-down ” condition, and to avoid the time-consuming necessity of assembling the parts when they reached France it was of especial concern to receive them set up and ready for immediate service. The plaintiff’s ships, if not the only ones, were perfectly adapted to this purpose, and for this reason were impressed into the Government service. An authorized official of the Steel Company, representing that and plaintiff company, on April 23, 1918, appeared in person before the chairman of the board and the same reasons advanced in opposition to the expropriation of the hulls of the ships were again urged and emphasized as reasons for leaving the ships in the possession of the plaintiff. Without going into greater detail than what we conceive to be the legal and binding incidents of this transaction, we think it is sufficient to say that the members of the board to whom the plaintiff’s officials addressed themselves did recognize that an undue hardship would be inflicted upon the Steel Company in the loss of its transportation facilities, and to remedy the same it was agreed that the board would assign and turn over to -the plaintiff a sufficient number of ex-Dutch ships, at that time operated under requisition, to cover the loss of its expropriated tonnage. Thus far, again the parties are in agreement. *26 The board’s willingness to furnish substituted ships involved of course the question as to the terms and conditions upon which the substituted ships were to be furnished, and it is as to this feature of the transaction that sharp and irreconcilable differences between the parties arise. The plaintiff contends most vigorously that the chairman of the board positively agreed that the Steel Company would be required to pay for the transportation of its cargoes on the substituted ships precisely the same cargo rate that it cost the Steel Company to transport its ore in plaintiff’s ships, i. e., about $2 per ton, and that the plaintiff would have to account only upon such basis. The plaintiff’s witnesses, without exception, affirm this contention. The chairman of the board and the other members of the board with whom the plaintiff conferred positively assert to the contrary, and not only deny individual authority to enter into such a contract but disclaim any intention to have done more than agree that a just and equitable rate for transportation on the substituted vessels would be fixed by the board as such, taking into consideration the unusual circumstances of the parties and the reciprocal value of rights obtained and losses sustained.
With indisputable certainty the court is enabled to abstract from the record certain fixed obligations emanating from the conferences of the parties. The board was to and did furnish the Steel Company sufficient ex-Dutch ships also requisitioned, which it had chartered from the Dutch owners, and the Steel Company accepted and used the same. It is also certain that the Steel Company did not expect to be granted the use of such ships without paying therefor, and that the board intended to fix a rate of hire. It is, we think, established that the board did not intend to fix a rate which would work a pecuniary hardship upon the Steel Company, but would arrive at the same upon a fair and equitable basis, keeping in view the fact that the necessities of the Government extended as well to the Steel Company’s output as they did for the use of plaintiff’s ships. It is, in our opinion, testing the disputed issue by the record, and in the light of the situation of the parties and the circumstances surrounding the transaction, impossible to *27 hold that the plaintiff has established its contention. There was no reason advanced by the plaintiff’s witnesses of sufficient convincing force to induce the board to assent to a rate of pay for the use of the ex-Dutch ships that was abnormally disproportionate to the rate the board agreed to pay the plaintiff for the use of its ships. It is difficult, in view.of the record, to conclude that the board was assenting to a proposition which not only removed all possibility of hardship from the plaintiff, but enabled it to profit from the transaction. The board agreed in the written requisition charters of plaintiff’s ships to pay therefor at the rate of $5.75 per d. w. t., time-form basis, or a total of $1,572,-431.82. If the plaintiff’s version of the agreement is sustained, the combined accounts of the plaintiff and its parent corporation, the Steel Company, show a profit to the extent of $588,911.89, for, under the terms of both the requisition charters and the contended-for rate, the plaintiff was reimbursed for all expenditures in connection with operations. The rate was a time-form rate. This, we think, is a most persuasive circumstance, indicating a confirmation of the board’s position with respect to rates. The board was obligated to pay the Dutch owners for the use of the eight ex-Dutch ships assigned to the plaintiff’s use, subsequently fixed at the rate of $8.3125 per d. w. t., per month, which, taken on the basis of a differential between the rate contended for by the plaintiff, would have resulted in a loss to the board of approximately two millions of dollars. Surely, factors of such monetary consequence, notwithstanding the emergency of the times, were indispensable considerations in fixing rates upon a fair and equitable basis.
Aside from the questionable authority of one member of the board to irrevocably fix a rate of hire, we are unable from the record to sustain the plaintiff’s contention that a rate of hire was fixed in a brief oral conference with certain board officials, in utter disregard of a known situation and known factors essential to arrive at a just conclusion. The fixing of rates for expropriated vessels was an important and deliberative function of the board, as such it involved investigation as to costs and a variety of additional factors, and *28 was not one easily arrived at. Just compensation was to be awarded the owners, and the extensive scope of the requisition policy and the deliberative character of determining the details thereof, it seems to us, tend, in connection with the additional factors cited, to sustain the board’s version of the conferences relied on, and establish the contract rate to be thereafter fixed by the board. In the absence of strong, convincing, and uncontradicted evidence establishing a departure from the regular and customary method of fixing rates for the use of vessels requisitioned, the regular method is to be sustained, and especially so when the officials of the Government charged with that responsibility without exception testify to an observance of the regular order.
On December 18, 1918, the commissioners of the board, at a meeting held on that date, authorized the Director of Operations, in his discretion, to settle the plaintiff’s account with the board on the basis of rate of hire for the plaintiff’s ships equal to $4.23 per d. w. t., this rate being based upon the approximate cost to the board in case the ore had been transported on the plaintiff’s own ships, and crediting it with the charter hire at regular rates. No action seems to have ever subsequently taken place with reference to this rate. Thereafter, on March 18, 1920, the commissioners of the board at a regular meeting thereof fixed a rate of $5,463 per cargo ton for ore, $7 per ton for coal, and 500 per cwt. for oil, and this rate was tendered the Steel Company and rejected. The plaintiff’s accounts remained open following this rejection until October 30, 1924, when the board by proper resolution rescinded its former action and by order directed a statement of the account upon the basis of a charge against the plaintiff’s accounts equaling the prevailing market rate for the use of the vessels at the time of user. The final account set up by the board is predicated upon a rate of $10 per ton for transporting ore, $7 per ton for coal, and 500 per cwt. for oil.
If we are correct in our determination of the contract made with the Steel Company, and the rate to be fixed was to be founded upon a just and equitable basis, the board was in error in fixing upon the prevailing market rate of hire, which would have the effect of penalizing the Steel Company, a *29 thing the board did not intend to do. The one rate fixed and tendered was the rate fixed at the meeting of the board on March 13, 1920, viz, $5,463 per ton for ore. This rate based upon the charter hire for American vessels, is a trifle less than the rate of hire fixed for the use of plaintiff’s ships and does not tend to penalize the Steel Company, but, on the contrary, discriminates in its favor. The rate so fixed takes into consideration the situation of the parties at the time and the important factors essential to an equitable and fair conclusion. This rate the Steel Company could have accepted at the time offered and is not inequitably disproportionate to the rate the Steel Company was willing at one time to pay. Finding XIV sets forth the details of accounting in accord with this established rate.
It is to be noted that the judgment herein includes an item with respect to the operation of the four lake vessels and the ex-Dutch vessels by the plaintiff as operating agent for the board. These items are not in dispute and are included in the findings as per stipulation of the parties.
Characterizing the transaction as purely one of requisition, the plaintiff invokes the established rule of adding to the amount of the conceded fixed rate of compensation due for its use of its ships interest at a reasonable rate from the date of the taking until the same is paid. Seaboard Air Line Ry. Co. v. United States, 261 U. S. 299. The legal difficulty of acceding to plaintiff’s demand lies in the fact that the conduct of the parties with respect to the requisition processes and the contracts that emanated therefrom disclose a situation which we think takes the case without the established rule. The repetition of certain facts is essential to the demonstration of what we think is the proper solution of this contention.
The plaintiff’s ships were in course of construction; the Government requisitioned the contracts to construct (Brooks-Scanlon Corporation v. United States, 265 U. S. 106), whereupon an express agreement was entered into by the terms of which the Government agreed to reconvey the title to the incomplete ships to the plaintiff when completed, at the cost price of completion, reserving the right to requisi *30 tion the use of the completed ships in the event their use by the Government became necessary, it being expressly agreed by the parties that the completed ships should remain in the service of the Steel Company, the plaintiff acting as operating agent for the Shipping Board, free from any and all charges for their use until such times as the emergencies of war exacted their use in the service of the Government. The plaintiff agreed that the rate of compensation for the use of its ships, in the event of user by the Government, should be the rate fixed from time to time by the board. In accord with this agreement, which both parties observed to the letter, the use of the ships was requisitioned by the board on October 12, 1917, and requisition charters which fixed rates were executed by the parties in conformity with their mutual understanding. The ships remained in the possession of the plaintiff and service of the Steel Company free of charge until impressed into Government service, as shown in Finding VIL At this point a new agreement came into being, which essentially changed the ordinary and customary processes of requisition, i. e., the board agreed to substitute for the plaintiff’s ships diverted for their use a sufficient number of ex-Dutch ships to care for the loss of plaintiff’s own ships, and this agreement involved of necessity — a fact conceded — the setting up of mutual accounts, it being then impossible to accurately ascertain the extent of indebtedness to finally accrue between the parties. The plaintiff knew it must account for the freight due for the use of the ex-Dutch ships, and of course it was aware of the compensation due it for the use of its own ships by the Government, but the rate and amount the Steel Company was to pay for the use of the ex-Dutch ships had not, as we find, been fixed or determined. Under these circumstances, and in view of the legal rule that interest as a part of compensation is allowable in order to make whole the party from whom property is taken, the rule as stated seems to be satisfied. Luekenbach Steamship Company v. United States, 272 U. S. 533. The plaintiff has never accounted for the freights properly to be charged for the use of the ex-Dutch vessels, except by way of a charge against what is *31 due it for use of its own vessels, the account between the parties at present standing as follows: $2,001,009.21 due the plaintiff, of which amount $1,626,396.82 is due under the requisition charters at $5.75 per d. w. t. per month for the use of its vessels, against which the plaintiff is chargeable with $400,772.34 heretofore received on this account, as well as the sum of $1,505,998.08 due and unaccounted for, covering the use of the ex-Dutch vessels, which with other items of fees, etc., earned, and receipts, all accounted for in the stipulation referred to in Findings VIII and XVI, leaves a balance due the plaintiff of $71,680.64.
In the Liggett & Myers case, 274 U. S. 215, the sole question was whether the transaction was a taking by eminent domain, and the Supreme Court in sustaining the transaction as one of requisition and not contractual used this significant language: “ Plaintiff’s consent was not sought; it was not consulted as to quantity, price, time, or place of delivery,” precisely the opposite of what occurred with respect to plaintiff’s accounts. We fail to perceive, aside from what has been said, any legal obstacle in the way of the plaintiff and the board agreeing upon what amount should constitute just compensation. This was done, and the reason for its nonpayment in keeping with the terms thereof was the inter-parties’ agreements growing out of the requisition and the unwillingness of the plaintiff to accept the amount tendered it in settlement of the account. The plaintiff might have accepted the sum due it — i. e., the amount we now find as due it — on and after March 13, 1920. Failure to receive the amount is not attributable to the Government. Therefore we think the plaintiff is entitled to a judgment for $71,680.64 and no more. It is so ordered.
Williams, Judge; LittletoN, Judge; and Green, Judge, concur.
Whaley, Judge, did not hear this case and took no part in its decision.